## The Samuel H. Crawford.

## The Niagara.

*(District Court, E. D. New York.   March 3, 1881.)*

1. Collision at Sea — Lookout — Lights — Torch-Light — Rev. St. § 4234—Salvage.

   Where a collision occurred at sea between a schooner bound to New York and a steamer bound to the Delaware, each libelled the other for damages, and the steamer also libelled for salvage, having taken the schooner in tow; and upon trial—

   *Held,* that the corner of the house on deck, where the schooner carried her red and green lights, was not a proper location for the side lights; but where it appeared that, in spite of this location, the lights were visible to the approaching vessel, the faulty location of the lights did not conduce to the collision, and does not render the vessel liable.

   Section 4234 of the Revised Statutes requires a lighted torch to be exhibited by a sailing vessel to an approaching steamer, whether the steamer be approaching from forward or abaft the beam; and where such torch is not exhibited the sailing vessel will be held in fault, unless clear proof be given that the failure did not contribute to the collision.

   Where lights of a schooner, plainly exhibited to a steamer, were not actually seen by the steamer until the schooner was too close upon her to avoid a collision, *held,* that the steamer was in fault; and, both vessels being in fault in this case, the damages must be apportioned.

2. Salvage Services.

   Services rendered by a steamer to a sailing vessel run down by fault of the steamer do not entitle the steamer to claim salvage.

*Goodrich, Deady & Platt,* for the Niagara,

*Beebe, Wilcox & Hobbs,* for the S. H. Crawford.

Benedict, D. J.   The three causes above mentioned have been tried together.   The first-named is brought by the owners of the steamship Niagara to recover of the schooner Samuel H. Crawford the amount of damages caused by a collision that occurred between those two vessels off the capes of Delaware on the thirtieth day of December, 1880.   The second action is brought by the same libellants to recover salvage for services rendered by the steamer Niagara to the schooner Samuel H. Crawford, immediately after the collision referred to, in towing her, when disabled by the collision, from the place of

collision to New York. The third action is brought by the owners of the schooner to recover of the steamer the damages caused to the schooner by the same collision. The mass of evidence that has been presented by the respective parties to this controversy establishes some things beyond the possibility of dispute, among them these: The time of the collision was about half-past 3 o'clock A. M. The weather at the time was clear and very cold, the thermometer being some 14 degrees below zero. It was dark, but, according to the libel of the steamer, her lights could have been seen by the approaching vessel for more than 20 minutes before the collision. The wind was from the north-west, and blowing fresh. The steamer was bound down the coast on a course south by west, three-quarters west, with her signal lights all burning brightly, and at her usual speed. The schooner was bound up the coast, sailing close-hauled, on a course north by east, or north-north-east, and nearly head on to the steamer. No one on board the steamer observed the schooner until the two vessels were so close together as to render collision inevitable. As soon as the presence of the schooner was known on board the steamer, the steamer's helm was put hard a-starboard, and signals given to the engineer in quick succession to slow, stop, and back. The vessels came in contact just as the engineer received the first signal. The jib-boom of the schooner came over the starboard bow of the steamer, the end of it hitting the steamer's foremast. The bowsprit of the schooner was broken off and turned back upon the schooner. The schooner's foremast was carried away, and the fluke of her anchor that lay upon her starboard bow was broken. The head-sails, bowsprit, and foremast of the schooner were thrown back upon her starboard bow. A stanchion from the steamer was thrown upon the schooner's deck near the main rigging, some 60 feet aft the bow, and upon the starboard side of the deck.

The port side of the schooner showed no marks of the collision. No part of the schooner was left upon the steamer, but the steamer sustained a severe injury upon her starboard bow, some distance from the stem, and showed marks

of contact with the schooner as far aft as the stern davit. These facts make a case of fault on the part of the steamer, provided the schooner was displaying lights capable of being seen by the steamer at a sufficient distance to enable her to avoid the schooner. The case, so far as the steamer is concerned, must, therefore, turn upon the question of lights upon the schooner. Upon this question there is a conflict of evidence, but a careful study of the testimony has satisfied me that the weight of the evidence is that the schooner, as she approached the steamer, was displaying a light capable of being seen by those in charge of the steamer in time to enable her to avoid the schooner. The evidence from the steamer on this point is the testimony of two seamen, who were stationed upon the steamer's bow as lookouts, and who agree in declaring that they were keeping a watchful lookout, saw the schooner first when close at hand, and saw no light upon her. In addition there is from the steamer the testimony of several persons who observed the schooner from the instant of collision, and observed no light upon her until after the vessels had passed each other, when she displayed a white light.

The weight of the testimony of those on board the steamer, who speak as to what they observed at the moment of collision, and immediately thereafter, is diminished by the fact that these observations were made in the confusion and excitement necessarily incident to such a serious collision, and by the further fact that it is difficult to reconcile the statement of several of the witnesses from the steamer that the port side of the schooner was presented to the steamer, as she swept past the steamer's starboard side, with the nature of the blow, the absence at that time of head-sails on the schooner, the injury to the starboard side of the schooner, and the movements of the schooner after the blow, as testified to by those on board of her.

In opposition to this testimony from the steamer, there is from the schooner the direct and positive testimony of six persons that both the red and green lights of the schooner were set and burning brightly at the time of the collision.

In addition, it is proved by these witnesses that from the time the steamer was reported by the lookout of the schooner, and for some time prior to the collision, the mate of the schooner was standing upon the schooner's forward house. The screens for the side lights of the schooner were placed on the forward corners of this house. The mate of the schooner, therefore, while these vessels were approaching each other, was standing between the two side lights, and where it was not possible for the absence of either of those lights to have escaped his attention. It cannot be believed that a mate so standing would have permitted either of the side lights to remain even dim, not to say extinguished, approaching, as he was, a steamer, seen to be coming nearly head on to him, on a dark night, with the thermometer 14 degrees below zero. It seems certain that, if there had been any deficiency in the side lights of the schooner, self preservation would have forced the mate, standing, as he was, to observe and remedy it at once. There is, besides, another circumstance, not of a character likely to be fabricated, which, if true, is conclusive to show that at least one of the schooner's side lights was burning brightly. It is proved by three witnesses that, after the collision and before the steamer had come to the assistance of the schooner, while those on the schooner were waving a bright light to call the attention of the steamer, and after a gun had been fired, one of the men suggested to the master of the schooner that a red light was the signal of distress, and it would be well to wave the red light; whereupon the red light was taken from the screen and waved towards the steamer to attract her attention to the schooner's distress. These circumstances, coupled with the superiority in the number of those who give direct evidence as to the lights displayed by the schooner as the vessels approached each other, make a clear preponderance in the weight of testimony in favor of the schooner's assertion that she had proper lights displayed.

An effort has been made to maintain that the side lights of the schooner, placed as they were on the corners of the forward house, were in a situation to be obstructed by the

head-sails of the schooner, and therefore were not visible to the steamer. But the measurements of the schooner show that the light on either side was less than four feet inside of the point of the shrouds opposite to the corner of the house on that side, and that none of the head-sails could be an obstruction of the light to a vessel ahead.

In regard to the red light being at the time the windward light, it is not possible to contend that that light, if burning properly, would not be visible to the steamer approaching, as this steamer was, nearly bow to bow.

I therefore conclude that the schooner, as she approached the steamer, was displaying lights which a watchful lookout on the steamer would have seen in time to avoid her, and that the cause of the failure on the part of the steamer to see the schooner until it was too late to avoid her, was the absence of such a lookout.

But it is contended in behalf of the steamer that, if it be found that the schooner had her side lights set and burning, the schooner must nevertheless be held responsible for the collision, because of the admitted fact that her side lights were placed inboard, on the corners of the forward house, instead of in the rigging. The difficulty with this contention is that the fact that the red light was a short distance further inboard than it would have been if placed in the rigging, becomes immaterial in this case when it appears that, located as the light was, it showed a clear light ahead without obstruction. I do not approve of the location of the schooner's lights, but I cannot find that the location in any way conduced to this collision, because it appears that there was nothing to obstruct those lights in the direction of the steamer. It is also, and with better reason, contended in behalf of the steamer that the schooner must be held in fault for omitting to comply with the statute, which declares that "every sail-vessel shall, on the approach of any steam-vessel during the night-time, show a lighted torch upon the point or quarter to which such steam-vessel shall be approaching." Rev. St. § 4234.

In regard to the statute, the ground has been taken in

behalf of the schooner that the intention of the provision was not to require a torch to be shown as an addition to the colored lights, but only to provide for the display of a light to a steamer when approaching from abaft the beam when the colored lights do not show, and that any other construction would impose an onerous obligation upon sailing vessels under circumstances when its performance would be useless. I should, for myself, feel inclined to limit the provision in question to cases of a steam-vessel approaching abaft the beam, if I could discover in the language of the provision any ground for such a limitation; but the words are general, and cover all cases of an approaching steamer, no matter from what direction she may come. Nor can I say that the provision, unless so limited, imposes a useless obligation upon a sailing vessel. It may be that under some circumstances the light of a torch would catch the eye when a colored light had escaped observation. And I am without information that experience has shown that the exhibition of a torch in addition to the colored lights would be a useless precaution. At any rate, the exhibition of a torch gives certain notice to the steamer that those on the sailing vessel have observed her approach. I am unable, therefore, to limit the operation of the statute to cases of an approach from abaft the beam. Upon the conceded facts, then, the schooner must be found guilty of fault, and responsible for the collision in question, because of her failure to show a torch to the approaching steamer; for it cannot be found as a fact in this case that a torch so shown would not have been seen by those on board the steamer.

If the proof had been that there was no one on the steamer located so as to be able to see a torch displayed from ahead, a different case would have been presented. Here, even if it be, as supposed by the schooner, that the lookouts on the steamer were absent from their posts for a part of the time while the schooner was visible, still there remained one man at the wheel and another in the wheel-house who might have noticed the torch if it had been displayed. Where a failure to see an approaching vessel is the immediate cause of a col-

lision, and the evidence shows a failure on the part of the approaching vessel to discharge a statutory obligation, the sole purpose of which is to enable an approaching vessel to be seen, clear proof would seem to be required to justify the conclusion that the collision was in no way attributable to the failure to discharge the statutory obligation.

Upon these grounds, therefore, I find that the collision in question was caused by fault on the part of both vessels, and accordingly the damages must be apportioned. The libel for salvage must, under such circumstances, necessarily be dismissed.

NOTE. In *Farwell* v. *The Steam-boat John H. Starin,* 2 FED. REP. 100, (S. D. N. Y.,) and *Schooner Margaret* v. *Steamer C. Whiting,* 3 FED. REP. 870, (E. D. Pa.,) it was held that a failure to comply with the statute did not render the vessel liable, unless the omission tended to produce the collision. In the first case it was deemed essential that the steamer should be approaching some particular "point" on the sailing vessel in order to render the statute applicable. In *Kennedy* v. *The Steamer Sarmatian,* 2 FED. REP. 911, (D. Md.,) it was held that the statute was sufficiently broad to require a light to be exhibited to a steamer coming up astern; while in *Brainard* v. *The Steamer Narragansett,* 3 FED. REP. 251, (D. Conn.,) it was further held that the requirement of the statute was not confined merely to those cases where a steamer was thus approaching a sailing vessel from astern.

In the case of *Kennedy* v. *The Steamer Sarmation, supra,* Chief Justice Waite held that the rule contemplated the keeping of a sufficient watch over the stern to enable the vessel to perform her duty as to the lights; and that it was negligence in a schooner, under the general rules of the sea, not to show a torch-light, or do something else calculated to give notice of her dangerous proximity to an approaching steam-vessel.—[ED.