GEORGE U. HIND, C. A. SPRECKELS, RUDOLPH SPRECKELS, G. WEMPE, WM. CARSON, H. D. BENDIXEN, JAS. H. NELSON, M. O. SIVERSEN, F. O. JOHANSEN, GEO. A. NELSON, N. J. McLEOD, G. M. FAGENLUND, J. S. HELLINGSEN, JOHN PILTZ, and HENRY M. WETHERBEE, *v.* WILDER'S STEAMSHIP COMPANY, a corporation.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED SEPTEMBER 22, 1900.   DECIDED OCTOBER 25, 1900.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

The general rule is that when a steamship and a sailing vessel approach each other at sea, it is the duty of the steamship to keep out of the way of the other vessel, and in such case it is the duty of the sailing vessel to keep her course. Possible exceptions may arise, but the case at bar is not one of them.

In such a case, it is the duty of the steamship, from the moment the sailing vessel is seen, to watch with the highest diligence her course and movements so as to be able to adopt such timely measures of precaution as will necessarily prevent the two boats coming in contact.

In a case of collision, the fact that the lights of the sailing vessel were not placed as required by law, will not defeat recovery by her owners for her loss, if such misplacing of the lights did not in

any way contribute to the collision and the same was caused by the negligence and incompetence of the officer in charge of the steamship.

Upon the evidence in this case, the steamship held to be in fault.

### OPINION OF THE COURT BY PERRY, J.

This is an appeal from a decree of a Judge of the Circuit Court of the First Judicial Circuit in Admiralty. The libel was filed against the Wilder's Steamship Company, a Hawaiian corporation, the owner of the steamship "Claudine," for the loss of the barkentine "William Carson," of which the libellants were the owners, through a collision with the "Claudine" alleged to have been caused by the negligence of the officers and crew of the latter ship.

The collision occurred at about 8:40 o'clock on the evening of the 27th of December, 1899, in the Kaiwi or Oahu Channel at a point distant from the harbor of Honolulu about ten or twelve miles, the Claudine striking the Carson near the cathead on the starboard bow. The Carson filled rapidly and in a few minutes turned over on her starboard side and sank. The wreck was sold at auction for five hundred and fifty dollars. The barkentine was a new vessel, being then on her first trip, and was, just prior to the collision, of the value of fifty-five thousand dollars.

The Claudine, carrying the lights required by law, placed in accordance with law, left the port of Honolulu on the day named at about 6:50 o'clock p. m., and proceeded on her course East three quarters South, at a rate of speed of about ten knots per hour bound for Lahaina on the Island of Maui. At about 7:45 p. m. second mate McNeill went on duty on the bridge, relieving Captain Weisbarth. From that time until the collision McNeill, and one Fisher at the wheel, were the only men on duty on deck. McNeill's testimony is that about half past eight o'clock he saw a bright light ahead bearing East or three quarters to half a point off the port bow, that he watched it for a little while, five minutes or so, and that it changed its bearing to a little on the starboard bow; that at this time, the quarter-master wishing to be relieved, he, McNeill, absented himself from the bridge for two minutes or

8

thereabouts in quest of another quartermaster, leaving no one on the bridge during that time. McNeill says that returning to the bridge, he still saw the light, moving to starboard, and then two bright lights close to each other and watched them for six or seven minutes longer. McNeill then left his post a second time, again without a substitute in his stead, and went to the saloon in search of the captain to inform him of the fact that he had seen a light or lights. This errand occupied him about a minute, and immediately upon reaching the bridge, he ordered the helm hard to port and, one or two seconds later, blew the whistle. This was about one or two minutes before the collision. Shortly after the blowing of the whistle the captain appeared on the bridge, followed, a little later, by McAllister, the first mate. At this point, the evidence of the men on the Claudine becomes contradictory as to what occurred. McNeill says that the captain gave three orders, first, "put her on her course," second, "hard to starboard," and, third, "hard to port." Fisher, on the other hand, says that but two orders were given, the first by McNeill, "hard to port," and the second by the captain, "hard to starboard," and that he had put the helm to starboard when the vessels struck. We believe the helmsman's evidence as to the number of orders to be correct. All are agreed that no attempt was made to stop or slow down the Claudine or to reverse her engines.

The Carson, then fifty-one days out from Newcastle, N. S. W., on that evening entered the Kaiwi Channel from the northerly side and was sailing in said channel on her way to Honolulu at the estimated rate of about two and one half or three knots per hour. From the time that she first sighted the Claudine, at about 8:15 p. m., until the collision occurred, she kept her course, whatever that course was. The barkentine was well manned and carried all the lights required by law of sailing vessels, to wit, a green light on the starboard side and a red light on the port side, but these were not fixed in the manner required by law, i. e., so as to shine at all times from two points abaft the beam to straight ahead. They were so placed on the rigging of the spanker mast that when the ship was sailing with square yards and booms and sails well over the side, there was a certain angle from straight

ahead outwards within which the light on that side would be ob-
scured.

It is undoubted that when a steamship and a sailing vessel ap-
proach each other at sea it is the duty of the steamship to keep
out of the way of the other vessel, and it is equally well settled
that in such case it is the duty of the sailing vessel to keep her
course, so as not to confuse those on board the steamer and so as
not to render unavailing any manoeuver of the latter. Instances
may possibly occur where this general rule would not apply, but
they are at best extremely rare. There is nothing in the case at
bar to take it out of the general rule. For the respondent in this
case it is contended that the collision was due, not to any neg-
ligence on the part of the Claudine, but to the failure of the Car-
son to comply with the requirements of the statute as to the plac-
ing of her side-lights, in other words, that owing to its position,
the starboard light was invisible to the Claudine and that in con-
sequence thereof the officer in charge of the Claudine, McNeill,
was misled into the belief, until it was too late to avoid the col-
lision, that the Carson was a steamship at a considerable distance
away and that there was ample sea-room for avoiding her.

In this connection it becomes important to determine what the
course of the Carson was from the time she was first sighted from
the Claudine until the collision. Counsel for respondent con-
tends that that course was nearly head on to that of the Claudine.
The evidence, however, does not support this view. The cap-
tain, the second mate and the helmsman on duty, all swear posi-
tively that the Carson was sailing on a southwest course. None of
the men on the Claudine, nor any other witness in the case, gives
any direct testimony to the contrary; but we are asked to disre-
gard the direct evidence just referred to, on the ground that, as
it is claimed, the testimony of these same men, to wit, Captain
Piltz, second mate Nelson, and helmsman Daniel McDonald,
and that of seamen Andrew Young and Alexander Campbell,
on the subject of the time when the Claudine's side-lights became
visible, is inconsistent with the theory that the Carson was sailing
on a southwest course and is consistent only with the theory that

she was sailing on a course nearly head on. A brief examination of the evidence will not be out of place.

Second mate Nelson, having testified that he first saw the Claudine a few minutes after eight o'clock, either coming out of the entrance of Honolulu Harbor or just outside of the entrance, and that the Carson was then ten or twelve miles distant, was next asked: "How was the steamer heading?" A. "I could see her side-lights then, but I see them shut the lights afterwards. I saw her red light first and then a minute or two afterwards I saw her green light." Q. "Which way was she coming?" A. "Right to our starboard side." Q. "What else did you observe as she was coming towards you—did you hear any signal from the steamer?" A. "When she was probably half a mile off, something like that distance, she appeared to head for our starboard quarter and looked like she might strike us. All at once she blew one whistle and ported her helm and then struck us on the starboard bow." This witness does not attempt to fix the time when he saw each or both of the lights, and furnishes no facts whereby to fix the time when the Carson crossed the course of the Claudine. It would be unfair to interpret his evidence as meaning that he saw both side-lights when the Carson was ten or twelve miles away,—it is agreed that those lights would not be visible for a distance of more than two or three miles—but if it were the fact that he saw both lights from a distance of ten or twelve miles, and if that is to be accounted for on the theory that the Carson was on the extended line of the Claudine's course at that time, then, since the Carson was in the same relative position to the Claudine at about four or five minutes prior to the collision, her course must have been practically head on and the vessels would have certainly cleared each other when the Claudine ported her helm.

McDonald testified: "Went to the wheel at eight o'clock, and a few minutes after eight I saw a light on the starboard beam, and I could make out that it was a steamer. I saw both lights, red and green, and then lost sight of the red light and saw the green light plainly, and then all at once I lost sight of the green

light and saw the red light again. The collision took place four or five minutes after." Q. "About five minutes after?" A. "Yes." * * * Q. "When did you first observe the steamer's headlight?" A. "A few minutes after eight." Q. "That was sometime before the collision took place?" A. "Yes." Q. "When did you first see the side-lights of the steamer with reference to the time the collision took place?" A. "About twenty minutes past eight. I saw it was a steamer." Q. "How did you know it was a steamer?" A. "I saw her red and green lights out, and I saw the mast-head long before then and from that I knew she was a steamer." Q. "Can you tell the court, from what you have said with reference to the side-lights of the steamer, in what way she shifted her course if at all—you were heading southwest?" A. "Yes. I first saw the steamer coming this way, and the bright light first, and she came closer I saw the red and green lights. I lost sight of the red light and saw the green light, and I thought she would clear." * * * Q. "How long after you first saw the red and green lights of the steamer did the red light disappear and you only saw the green? How long was it that you saw both lights?" A. "Only for a few minutes, when I first saw the steamer, a little after eight o'clock." Q. "How long did that condition of affairs keep where you only saw the green light—was it until just before the change of course?" A. "I saw both red and green first and then lost sight of the red and I could see the green plainly, and all at once I lost sight of the green and saw the red and then they blew the whistle." Q. "Just before you lost sight of the green?" A. "Yes." This witness' estimates of the passage of time are clearly incorrect and unreliable. Minutes to him seem to have been of short duration. He fixes the change of the Claudine's course, i. e., the time when he lost the green light and saw the red, as happening five minutes before the collision, while the great preponderance of evidence shows that that was an interval of not more than one or two minutes. If his estimate that he first saw the side-lights of the steamer at 8:20 o'clock, i. e., twenty minutes before the collision, was based on the same standard of measurement, then

he actually saw those lights together about six or seven minutes before the collision.

Andrew Young says: "I was walking the deck and I saw the steamboat shortly after I came on deck, and I saw both lights, and they were making for our stern at right angles, and he ported his helm and blew his whistle and run right into us." Q. "State to the court what direction, with reference to your course, the steamer was steering before the collision when you saw the mast-head light?" A. "They were coming fair on to us. I could see his three lights." Q. "The masthead light and the other two lights?" A. "Yes, and the green and the red lights." * * * Q. "How long after she ported helm before she struck the Carson?" A. "As near as I can guess, about three or four minutes." * *· * Q. "Just before the steamer blew her whistle and ported her helm, did you see both or only one light?" A. "I saw both lights?" Q. "You saw both lights from the time you saw the first lights until the helm was ported?" A. "Yes." Q. "And then the green was shut off and you saw the red?" A. "Yes." Q. "As long as you saw both lights, she was headed for your vessel?" A. "Yes." Q. "For which part of the vessel?" A. "About midships." Young makes no attempt at fixing definitely the time when these various lights were seen, further than that the collision occurred three or four minutes after the Claudine's helm was ported, a different estimate from that given by any other witness. It is simply another illustration of the fact that it is well nigh impossible for a number of men, situated as those were, to agree on the details, whether as to the order or time of their happening, of events which immediately precede or accompany a disaster of that kind.

Alexander Campbell first saw the masthead light, then the green light and then the red light. Whether through inattention, or for whatever reason, he did not see the green and the red lights together at any time prior to the collision.

The substance of Captain Piltz' testimony on this subject is that he first saw the green and the red lights together at 8:27 o'clock and that these continued in view until 8:35 when he lost the red and saw the green only; that about three or four min-

utes later he lost the green and again saw the red and that one or two minutes after that the vessels struck. If the Claudine first ported her helm just one minute before the collision, then the Carson crossed the Claudine's course less than three minutes before the collision, but if two minutes elapsed between the porting of the helm and the collision, then the crossing of the courses may have taken place about six minutes before the collision, the two vessels being then nearly one and one quarter miles apart. That would be at about 8:34, at which time, Captain Piltz says, both lights were visible. We do not understand that with vessels thus separated, one of them going at the slow rate stated, the two lights are visible only for an instant. Much depends upon the actual rate of speed of the Carson and perhaps also upon the effect of the swell of the sea upon the Claudine and the steadiness or unsteadiness of the latter's course. Moreover, the captain, too, may have erred in his estimates of time. Although he endeavors to be exact in his statement of minutes, he relies only upon his judgment and recollection. The period during which the two lights were together visible to him may well have been three or four minutes shorter than that testified to by him. It would not be safe or right to allow inference or argument based on such very fine differences in calculations of time made with reference to events such as those that happened on that evening, to overcome the direct and positive evidence of the three witnesses named that the Carson was sailing on a southwest course. If there was a deliberate conspiracy on the part of those three men to testify falsely as to the course, Captain Piltz at least should be credited with intelligence enough to have seen the effect of fixing the visibility of the Claudine's two lights at too early a time; and he would in such case have attempted to shape his testimony accordingly.

The undisputed fact that the two vessels swung together upon striking is proof corroborative of the other evidence that the Carson's course was southwest.

Upon this and all the other evidence in the case, therefore, we find that the Carson's course was southwest and that the green light was visible to those on board the Claudine. That light was

in fact seen by McAllister, the chief officer of the steamer, when he came on the bridge after the porting of the helm and the blowing of the whistle, and about thirty seconds, according to his estimate, before the collision. This is sought to be explained by counsel for the respondent on the theory that the Carson luffed to avoid the blow, but there is no evidence that will justify such a finding. Bearing in mind the relative positions of the vessels at that time, it follows necessarily that the Carson's green light was in an even better position, prior to the porting of the helm by the Claudine, to be seen by the officers of the latter vessel. Either it was seen by McNeill or it was not. If it was, no sufficient excuse has been shown for his failure to keep out of the Carson's way; if it was not, then it must have been due to inattention to duty, for he insists that his eyesight is good. McNeill's defense of himself is that, when he reached the bridge on the return from his search for the captain he thought the other vessel was still a long distance away and that there was ample sea-room, but his actions disprove this claim. Immediately on reaching the bridge, he gave the order, "Hard to port, light right ahead," following the order at once with the blowing of the whistle. This indicates that he knew that the other vessel was very close to him. In this connection we are forced to believe that had McNeill remained continuously at his post instead of leaving it to call the captain, he would have realized the situation sooner and need have had no difficulty in keeping out of the way. He showed gross negligence and incompetency in twice leaving his post under the circumstances. As remarked by the trial judge, from his whole testimony it is apparent that he (McNeill) was either recklessly careless of the significance of a moving light at sea or so wanting in confidence in his ability to manage a ship approaching possible danger that he failed to do his duty.

Reverting again to McNeill's claim that he was misled into believing and did believe, when he ported his helm, that the Carson was then a long distance away, he says in support of that claim that the captain, on reaching the bridge, inquired why the whistle had been blown and that, on having his attention called to the light or lights ahead, he said, "the light is too far away to see any

side-lights. Keep on the course again," and that he, McNeill, thereupon gave the order to "starboard" the wheel. If the captain had in reality ordered the Claudine to be put back on her course, that fact would certainly be of great weight as tending to show that the officers of the Claudine were misled as to the position of the Carson. It is an important point in the evidence. The testimony of the helmsman, that the only orders given were one by the second mate "hard to port," and one by the captain, "hard to starboard," has been already referred to. Another item that we cannot allow to pass unnoticed, is the absence of Captain Weisbarth from the witness stand. His testimony on this point would have been of great value as tending to absolve the Claudine from blame, i. e., if McNeill's statement is true. The failure of the respondent corporation, in view of the great care it has exercised and of the expense it has undergone in preparing for the trial, to produce the master as a witness, is a suspicious circumstance.

Our finding, then, is that the collision was due to the negligence and incompetence of the second mate of the Claudine and that the misplacing of the lights of the Carson did not contribute thereto.

The law is clear that under these circumstances the liability for the loss rests upon the respondent.

"The failure of a vessel to comply with the navigation laws in regard to lights is such negligence as will defeat recovery by the owners of the delinquent vessel for injuries received by it, if the absence of the proper lights in any way contributed or tended to bring about the collision, the other vessel not being at fault. But where the evidence shows that the collision resulted from other causes, and not from such failure to exhibit proper lights, the delinquent vessel is entitled to recover notwithstanding such fault."—Spencer on Marine Collisions, Sec. 28.

"If a vessel disregards the provisions of a statute, the burden is on her to show in case of a collision that the accident was not owing to such neglect; but if it is shown that the breach of the statutory provision did not in any degree contribute to the col-

lision, the violation of the statute will have no effect."—1 Parsons on Shipping and Admiralty, 595, 596.

"The true construction of this is, that if the rule has been violated or omitted to be obeyed, and yet such violation of the rule does not occasion the collision, it is the same as if it had not been violated at all."—*Mackay v. Roberts,* 9 Moore, P. C., 368, cited in 1 Parsons Shipping and Admiralty, 596, n. 1.

"Neither can the want of a light on board the Phantom influence the decision; it did not in any degree contribute to the disaster, and could have exercised no influence in preventing it; for there was nobody on the deck of the brig to see it, and to exhibit a light in return, or hail her on her approach."—*Cohen v. The Mary T. Wilder,* Taney 573.

"The regulations for the government of pilots required that the Griswold should have side lights. She had none. It cannot be denied that the omission to comply with this regulation was a negligence rendering the owners of the Griswold liable for all damages resulting from their non-compliance with it; but unless the collision resulted from the absence of the side lights, or their absence contributed to the disaster, the omission to provide and use them is not a matter in extenuation of or in defence of the defendant's wrong."—*W. T. Co. v. N. J. S. Co.,* 51 N. Y. 372.

See also *Morrison v. The Central Steam Navigation Co.,* 8 Exch. 731; *The Livingstone,* Swabey, Adm., 519, 521; *The S. H. Crawford,* 6 Fed. 906; *The Panther,* 24 Eng. Law & Eq. 588, 589; *New Haven S. & T. Co. v. Vanderbilt,* 16 Conn. 420, 429.

The following, also, is in point, though on another branch of the case at bar. We approve of the rule there stated. "Nautical rules require, that where a steamship and sailing vessel are approaching on opposite directions, or on intersecting lines, the steamship, from the moment the sailing vessel is seen, shall watch with the highest diligence here course and movements, so as to be able to adopt such timely measures of precaution as will necessarily prevent the two boats coming in contact."—*The Carroll,* 8 Wall. 302, 306.

We affirm the decree appealed from except as to the sum of five hundred and fifty dollars, proceeds of sale of the wreck, which sum should be deducted from the amount awarded below. This item was evidently overlooked in the preparation of the decree appealed from. The cause is remanded to the Circuit Judge of the First Circuit with instructions to modify the decree in accordance with these views.

*Paul Neumann* for libellants.

*Kinney, Ballou & McClanahan* for respondent.