FLEMING et al. v. LAY et al.

(Circuit Court of Appeals, Sixth Circuit. June 10, 1901.)

No. 880.

1. PARTNERSHIP—ESSENTIAL ELEMENTS OF CONTRACT—SHARING OF LOSSES.

The several owners of tugs employed in the towing business at the same port formed an association, selecting a manager who handled and managed all the vessels, collected the earnings, paid all the expenses; and distributed the profits of the business among the members in proportion to the agreed value of the vessel or vessels owned by each. *Held*, that such association was a partnership, each member of which was responsible for the proper performance of a service contracted for by any one of the vessels, and liable for a loss occasioned by her negligence or unskillful navigation; an agreement to share losses being implied by law from the other terms of the contract, although not expressly incorporated.

2. SALVAGE—RIGHT TO COMPENSATION—TUG ASSOCIATION.

A tug-line association was formed by the owners of all the tugs operating from a certain port, the agreement providing that the vessels should be under a common management, and their net earnings should be divided upon an agreed basis. One of such tugs, by negligent navigation, caused the stranding of a schooner which she was towing in a place of great peril, and procured other tugs and vessels of the association to come to her assistance. With their aid the schooner and the greater part of her cargo were saved, with some loss and damage. *Held* that, whether the association be regarded as a partnership or not, the services performed by the assisting tugs were rendered to the association, and not to the schooner, and that she was not liable therefor.

3. SAME—SUIT FOR COMPENSATION.

The fact that, in the adjustment of insurance and general average between the schooner, insurers, and cargo owner, a charge for the salvage services was taken into account, would not render the schooner liable for such services at suit of the owners of the tugs, being a matter with which the latter had no concern, nor would it constitute an admission of liability on the part of the schooner, entitled to weight, where it appears that her owners were not at the time advised of the relations existing between the several tugs.

Appeal from the District Court of the United States for the Northern District of Ohio.

Harvey D. Goulder, for appellants.

Roger M. Lee, for appellees.

Before LURTON and SEVERENS, Circuit Judges, and THOMPSON, District Judge.

SEVERENS, Circuit Judge. This is a suit in admiralty, brought by the libelants, who describe themselves as composing a voluntary association called the Sandusky Harbor Tug Line, against Flem-

ing, McCarthy, and Windmuller, as owners of the schooner Schuylkill, and the Mastodon Iron Company, an Illinois corporation, owner of the cargo of the Schuylkill, in a cause of contract, to recover for services performed by the tug Buffalo, owned by Henry Lay, John Lay, and Woodford, the tug John E. Monk, owned by Henry Lay, Ditche, and Mehling, the tug Dan Conelly, owned by Groch, the scow Onward and the steamer D. Dussault (the latter two being lighters) in rescuing from peril the Schuylkill and her cargo. The libelant Jacob Lay was joint owner with John Lay of the tug Edward Fiske, the other tug managed by the association, but which did not participate in the services. The circumstances of the peril and the services, as alleged in the libel, were as follows: The Schuylkill, laden with a cargo of iron ore, while on a voyage to the port of Sandusky, was stranded on a reef on the southern extremity of Bass Island, in Lake Erie, where she was in an exposed position and in grave peril. Thereupon the Buffalo, the John E. Monk, the Dan Conelly, the Onward, and the D. Dussault were sent by the libelants, as is alleged, to rescue her. In this, after prolonged efforts, they succeeded, and the Schuylkill, some portion of her cargo having been jettisoned and other portions lightered, was taken into the port of Sandusky, from whence, after discharging her cargo, she was towed to Detroit by the Dan Conelly for repairs. This latter service is included in the charges which the libelants seek to recover. The defense was that the Sandusky Harbor Tug Line was, in fact, a partnership of the owners of the tugs above named, which were managed and controlled by Henry Lay, to whom that authority had been delegated; that, as the Schuylkill approached the harbor of Sandusky, the Dan Conelly was sent by Henry Lay, acting for the association, to tow her in, and that while doing this the Schuylkill was, through the culpable negligence of the Dan Conelly, stranded upon the reef as stated in the libel; that, after several unsuccessful efforts to get the schooner off, the Dan Conelly proceeded to Sandusky for assistance; that, on the disaster being reported to the association, its manager dispatched the tugs and lighters before mentioned to help the Dan Conelly in relieving the schooner from her peril; and that the services which they rendered are those sued for in the libel; and it is contended that these services were not rendered under any employment by the schooner, but were supplied in aid of the Dan Conelly and its owner, and, directly or indirectly, for the benefit of the association. It sufficiently appears from the libel and the testimony that the owners of these tugs, having found from experience that their independent action in running out simultaneously to answer calls from vessels about to enter the harbor produced discord and loss, entered into an agreement to form an association, under the name of the Sandusky Harbor Tug Line, which should, by its manager, handle and manage all the tugs, collect all the earnings, pay all the running expenses, and distribute the profits of the business among the owners of the tugs in proportion to the valuation of the tugs,

which was fixed by the agreement. It appears, also, that in practice it sometimes happened that the captains of the several tugs sometimes collected the money due for a particular service at the time it was rendered, but in such cases they reported and paid it over to the manager. It also appears that frequently the amounts necessary to pay the crews and other running expenses were paid to and disbursed by the captains for these purposes. It does not appear that any express agreement was made in regard to settling for losses which might be incurred by the several tugs in the prosecution of the business, or that any occasion had ever arisen for dealing with such a contingency. Upon this state of facts is presented the question whether the association was a partnership.

The law in respect to the facts necessary to constitute the relation of partnership has been at times in a somewhat unsettled state in many jurisdictions, but in the decisions of the supreme court of the United States we do not find any substantial variation of the doctrine expressed by Mr. Justice Gray in delivering the opinion of the court in Meehan v. Valentine, 145 U. S. 611, 12 Sup. Ct. 972, 36 L. Ed. 835, wherein he said, at the opening of the opinion, that "the requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits"; and, again, after discussing the authorities: "In the present state of the law upon this subject, it may, perhaps, be doubted whether any more precise general rule can be laid down than, as indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions." In the case of Ward v. Thompson, 22 How. 330, 16 L. Ed. 249, referred to by Mr. Justice Gray in connection with the first of the above quotations, the decision turned upon the question whether, by the stipulations contained in a contract between the parties relating to the employment of the steamer Detroit during the years 1852–53, a partnership was created. The material facts were thus summarized by Mr. Justice Grier:

"The Wards contributed a steamboat, to be put into a line for freight and passengers, which had also a contract for carrying the mail. Thompson contributed the good will of an established line, together with his care, skill, and experience. He is to have the general management of the business, and the selection of the officers and crew; but the clerk, or receiving and disbursing agent, is to be appointed by the Wards, and to be under their control. The receipts of the steamer are to be applied (1) to pay expenses; (2) insurance; (3) six thousand dollars to Ward; (4) three thousand dollars to Thompson; (5) the balance of the profits to be equally divided."

The learned justice then proceeds to say:

"Here we have everything necessary to constitute a partnership: First, the parties have joined together to carry on a certain adventure or trade for their mutual profit,—one contributing the vessel; the other his skill, labor, and experience, etc. Second, there is a communion of profits on a fixed ratio."

It is extremely difficult to distinguish that case from the present in any essential particular. In that, the Wards contributed their vessel, and Thompson contributed his skill and labor. In this, the parties each contributed a vessel and their skill and labor. In that, one of the parties managed the business. So, in this. In that, the running expenses were paid out of the joint earnings. It was so here. The net earnings were divided between the parties contributing, and that was the stipulation here. What is of great significance, in both cases the profits were owned by all the parties, and they shared in them as principals. None of them received, as agent or in any other capacity, a sum out of profits which belonged to others. Moreover, in the case before us, the owner of each of the tugs was, by reason of his sharing in the ultimate profits, interested in all the sums earned in the operations of each, and correspondingly the operations of each were in the general business of all. It is not important that the minor stipulations in contracts of partnership vary. The subordinate incidents may differ, but, if the enterprise is aimed to secure a joint profit which is to be divided between those contributing to the business as principals, the distinguishing features of a partnership exist. If it follows from the existence of a partnership that each should have the power of agency, it may be answered in the present case that each has delegated his power in that regard to the general manager, who thereafter by consent exercises the powers of each. Indeed, such delegation of power to a common agent is not an infrequent incident to the business of partnerships. It is not material that there should be any express stipulation that the losses should be borne equally in order to create a partnership. Indeed, some of the authorities hold that it is not essential to a partnership that there should be a liability to share losses. However that may be, the failure to make an express agreement upon that subject is not important, for the liability will be implied. "Except in cases specifically provided for by statute, an agreement to share profits, nothing being said about losses, amounts prima facie to an agreement to share losses also, for it is but fair that the chance of gain or loss should be taken by the same persons; and it is natural to suppose that such was their intention, if they have said nothing to the contrary." 1 Lindl. Partn. (Wentworth's Am. Ed.) 12, and see English and American cases there cited; Bank v. Gallaudet, 120 N. Y. 298, 24 N. E. 994. The last of the above quotations from the opinion of Mr. Justice Gray seems to us to express with great exactness the rule of law upon the subject as deduced from the decisions of that court, as well as that resulting from the modern decisions elsewhere. Vandewater v. Mills, 19 How. 82, 15 L. Ed. 554; Berthold v. Goldsmith, 24 How. 536, 16 L. Ed. 762; Beauregard v. Case, 91 U. S. 134, 23 L. Ed. 263. Applying that rule to the present case, it must be held that a partnership was created by their agreement. It is sometimes said that, in order to constitute a partnership, the parties must have intended to assume that relation towards each other. But

by this it is meant to say they must have intended to make such stipulations as in láw constitute a partnership, and not that they intended the conclusion without regard to the conditions upon which it results as matter of law. It certainly cannot be meant to say that, where the parties have entered into an agreement which contains all the incidents of a partnership, the mere unexpressed mental apprehension of its effect will control the legal consequence. "If," says Lindley, "they have in fact stipulated for all the rights of partners, an agreement that they shall not be partners is a useless protest against the consequences of their real agreement." 1 Lindl. Partn. (5th Ed.) 11.

It should be observed in this connection that the libel is framed upon a theory which involves the existence of a partnership between the libelants. One of their number, Jacob Lay, had otherwise no legal relation to the matter of the suit except through his joint interest in the business of the association, and, if the interest was joint, its profits would be joint. He was not an owner of any of the vessels whose services are sued for.

If the fact was that these tug owners were in partnership, it goes far to a determination of the controversy. It was the duty of the tug which had stranded the schooner by its negligence, and, through it, the duty of the association, to relieve the vessel from the peril in which it had been placed. Not only this; it was for the common interest and benefit of them all that the vessel and cargo should be saved from the destruction which threatened them. For such services rendered in such circumstances no liability would rest upon the schooner. The Clarita and The Clara, 23 Wall. 1, 18, 23 L. Ed. 146; The Samuel H. Crawford (D. C.) 6 Fed. 906; The Charles E. Soper (D. C.) 19 Fed. 844. And a request by the schooner that the duty owed her should be performed would not give rise to an obligation to pay for it, nor would a subsequent promise to pay rest upon any valid consideration. There is no claim that there was any promise to pay made at the time. We have, therefore, no occasion to determine whether the result might be altered if there was a promise to pay which moved the rendering of the services.

But, independently of the question whether there was a partnership between the owners of the tugs, we think a like result must follow. These owners had joined in an association for a common business. They controlled the supplying of tugs to vessels needing these services. The vessels had to take whichever one was sent. All the tug owners were concerned, not only in the profits, but also in the efficient service of those in the association. We quite agree with the court below in saying that it was a natural thing, and one to be expected, that they would go to the relief of their associate when his tug was in trouble, and threatened with a serious disaster, which might involve the destruction of the ship, its cargo, and the lives of the crew. And we have no idea that they had any understanding that in doing so they were working for hire for the schooner. Or, if they made calculation of

pecuniary advantage, it could not then be known but that the consequences of the threatened loss might all rest upon the owner of the tug, and they might well think of danger to themselves. And what was said by the captain of the Dan Conelly when he left the stranded schooner to go to Sandusky for help enforces the moral probability arising upon the duties and motives of the situation. He said to the captain of the schooner: "We got you on, and we will have to get you off. I will go and get some Sandusky tugs, and pull her off." In either aspect of the relation of the owners of the tugs to each other, we agree with the court below in its conclusion of fact that there was no employment by the schooner of the tugs, for the services were rendered without any expectation of payment by the schooner.

There is more doubt about the charges for the services of the lighters. The evidence in regard to their employment is conflicting. They were not associated in the tug line, and were not under the same duty. As to whether they were employed by the captain of the schooner or by the association we are somewhat uncertain. It appears that they were paid by the association, but we are inclined to believe that the payment was made upon the request of the captain of the schooner, and upon his promise to refund. If this be so, it would seem to imply that the lighters were employed by him. Upon the whole, we have concluded to allow the claim for these services.

These conclusions seem to us to dispose of the controversy. But it is contended by counsel for the appellees that whatever our conclusions might be upon the questions whether there was a partnership between the owners of the tugs, and whether the tugs were employed for hire by the schooner or were performing a service in their own duty or interest, there are other grounds on which the claims of the libelants may be supported. The chief of these is in the following facts: Directly after the schooner was repaired at Detroit, and preparatory to a settlement with the insurers as well as to adjust the loss which had ensued between the interests entitled to and liable to make contribution on account of the loss, the owners obtained an adjustment upon general and particular average. In the statement of the adjuster there were included in the list of the expenditures and sacrifices of the Schuylkill the items for which this suit is brought, save that a part only of the present claims for the Dan Conelly were so included; and that adjustment was made the basis of the settlement with the insurers. Two months after that, the owners of the schooner filed their libel in the district court for the Northern district of Ohio, against the Dan Conelly, to recover the damages sustained by the stranding of their ship through the negligence of the tug. Groch appeared as owner, and filed a petition for a limitation of his liability, alleging his freedom from fault. The tug was appraised at $2,000, and, upon his giving bond, the tug was discharged. The case proceeded to a hearing; the liability of the tug and the right to the limitation of liability were established; the damages were

found to be $3,640, to be liquidated by the payment of $2,000, the appraised value of the tug, with the interest thereon, amounting in all, to the date of the decree, to $2,909.33. It is claimed that the damages found to have been sustained by the Schuylkill included the items of service for which the present suit was brought. This is sought to be established by reference to the proceedings for average and the settlement with the insurers above mentioned, and to the libel and decree in the former case. The libel in that case, after narrating the employment of the tug and its negligence in stranding the schooner, proceeded to state that "the tug was unable to pull her off; other tugs were employed; the life-saving crew from Marblehead also came to her assistance; ladders were procured with extra laborers, and, after lightering some two hundred tons of her cargo, the water having arisen somewhat, she was taken off the reef and towed into Sandusky"; "that the loss and damage to the said vessel, including the value of six tons of cargo jettisoned, amounted to the sum of $3,225.61, besides which the said schooner was necessarily detained in getting off the reef and in making repairs, rendered necessary by the damage, for a period of ———— days, to the further damage of her owners, the said libelants, in the further sum of $600, making together a loss and damage to the owners of said vessel to the amount of $3,825.61." The owner of the cargo was a co-libelant, and claimed an interest in the above-stated sum by reason of its liability upon the adjustment in general average. The libel further stated that certain insurance companies had paid the following sums upon said adjustment, as follows: The Western Insurance Company, $580.91; the Louisville Underwriters, $697.10; the Commercial Union Assurance Company, $697.10,—"whereby each of said companies acquired an interest in the claim herein sued for"; and the libel prayed for a decree "for their aforesaid damages, with interest and costs." It will be observed that there was no statement of the amount of expenditure for salvage services, nor were they included in the statement of the loss and damage to the vessel. Upon the hearing, the general and particular average adjustment was produced by the libelant, and Fleming, one of the owners, being examined as a witness, testified as follows:

"Q. You say these bills marked Exhibit H, 1 to 6, inclusive, have not been paid yet? (The bills referred to are for the services of the tugs and lighters as contained in the statement of the adjuster.) A. No. Q. Why not? A. Because it was a question on my part who they were incurred by,—whether by the vessel or Mr. Groch. Q. You have introduced them in evidence here as part of your loss, have you? A. Not necessarily. Q. Do you make any claim on them? You must have introduced them for a purpose. A. I think I am amenable for the bills if action were brought against me. Q. Then you claim you ought to recover for them in this suit against the tug? A. Well, that depends. Mr. Groch may have undertaken to pay them himself. I will leave that for my attorney to determine.",

We are left without information as to whether they were allowed by the commissioner or the court. Although some parts of the commissioner's proceedings were introduced in evidence, there is

nothing which shows how he dealt with these items. If his report included them in the damages, it was easy to prove it. As the burden was on these libelants to make out that fact (if it be material here), and it is not shown, the presumption must be that they were not included. But it is said that the amount allowed, compared with what was claimed, proves it. It appears that the sum claimed —$3,225.61—as the "loss and damage to the vessel" is the same as the total amount of the bills as stated by the adjuster in making the averages. Why this sum was put forward as the amount of damages claimed in the libel we are at a loss to understand. The owner of the tug was not concerned with those proceedings, and was in no manner bound by or affected by them. The whole amount claimed, including damage, was $3,825.61. The sum allowed was $3,640. As we have no proof of the particulars of which this allowed amount was made up, it would be a mere conjecture to say that it included the salvage services. The fact is not, therefore, concluded by the decree, nor is it established by convincing proof. Moreover, the presumption in the absence of proof which was accessible is, as we have said, the other way. Other considerations are applicable to this subject. These libelants, including the defendant in the former suit, were strangers to the adjustments in general and particular average, and with the insurers. It was a matter of indifference to them upon what basis those adjustments were made. The latter neither increased nor diminished the amount of recovery in the former suit, but they were properly alleged to enable the court to denote upon the record the trusts and the amount thereof to which the recovery would be subject, in order to guide it in disposing of the funds. To the adjustment upon the average the only interests entitled to representation were the schooner, the freight, and the cargo, and in the settlement of the insurance only the insurer and the insured. In the adjustment it seems that the general rule was recognized that salvage services are to be taken into the reckoning, and, so far as we know, no inquiry was made as to whether the particular facts of the case were taken into consideration in allowing these services as general charges in favor of the Schuylkill. Whether, in view of the fact that such services had been rendered, and the benefit thereof was represented by the vessel, the circumstances in which they were rendered should have affected the adjustment, we have no occasion to inquire. With regard to the settlement with the insurers, it was equally indifferent to the party or parties liable for the tort how the settlement was made,—either in whole or in part. The liability of the tug was for the damages it had inflicted. If they had performed salvage services, that fact should have gone in mitigation of the damages, or, rather, should not have been allowed for. And this, as we are inclined to think, in the absence of any persuasive proof to the contrary, was what happened. Our conclusion upon this general subject is that there was no obligatory effect due to the proof of the proceedings referred to. But perhaps, if they led to any definite conclusion, they might be referred to for their pro-

bative effect as indicating an admission on the part of the owners of the Schuylkill that they were liable to pay for the charges sued for. However, we think that effect is slight. The proof shows that all along the owners have been in doubt as to where the legal liability rested, and that their admissions, if we call them such, were made with reservation. Their only effect upon any question in the case would be to reflect back upon the inquiry as to whether the schooner employed the tugs or the lighters in such sense as made her liable to pay for the services in question, and upon that subject we have already expressed our opinion.

Another point made in behalf of the libelants is that although no agreement for employment was made, still if the services were, in fact, rendered, with the knowledge and acquiescence of the respondents, the law would imply a promise to pay on their part. Perhaps it was upon this ground that the district court reached the seemingly incongruous conclusion, after finding that there was no employment of the tugs in behalf of the Schuylkill, that nevertheless her owners were liable for the services. But this doctrine only applies to cases where the services are rendered in circumstances under which they are usually paid for, and where the party for whom they are rendered must be presumed to understand that payment is expected. As we have already said, in effect, such circumstances did not here exist.

What we have said covers all the questions presented by the record. The decree of the district court will be affirmed as to so much thereof as allows a recovery for the services of the lighters the Onward and the D. Dussault, with interest as allowed by the decree, and reversed as to the other claims therein allowed. The appellants will recover their costs in this court, but will pay the costs in the court below.