FECHTELER et al. v. PALM BROS. & CO.

(Circuit Court of Appeals, Sixth Circuit. November 23, 1904.)

No. 1,278.

1. EQUITY JURISDICTION—SUIT FOR ACCOUNTING—INADEQUACY OF LEGAL REMEDY.

A bill for an accounting under a contract between two large mercantile houses, which required each to render to the other annually a statement of its entire business for the preceding year, and to pay to the other a percentage of its gross profits, states a case of equitable cognizance, on the ground that the remedy in equity, through a statement of the accounts by a master, is more complete and adequate than that at law by an action of account.

2. EQUITY PLEADING—BILL FOR ACCOUNTING—PRAYER.

It is not a ground of demurrer to a bill for an accounting that no specific relief beyond the accounting is prayed for, where the bill states a case of complicated accounts, such as to give the court jurisdiction, and contains a prayer for general relief, under which a money decree will be entered if complainant shall be entitled thereto.

3. CORPORATIONS—POWERS—FORMING PARTNERSHIP.

In the absence of express statutory authority, a corporation has no power to enter into a partnership.

4. PARTNERSHIP—EVIDENCE TO ESTABLISH—SHARING IN PROFITS.

As between the parties to a contract, whether or not it creates a partnership is governed by their actual agreement and intention; and the fact that there is a participation in profits is, at most, only evidence of an intention to form a partnership, which may be overcome by other facts or circumstances showing a different intention.

5. SAME—CONTRACT CONSTRUED.

A contract between a firm and a corporation engaged in the same line of business in different places provided that each should have the privilege of buying from the other at cost price such goods as it might select from the stock of such other, and also that each should pay to the other at the end of each year "a sum of money equal to" a designated percentage of its gross profits, defined in the contract to mean the proceeds of its gross sales, deducting therefrom only the first cost, import duties, and carriage. *Held*, that such contract did not provide for a sharing of profits, as profits, such as to raise a presumption of a partnership, and that, in view of its other provisions inconsistent therewith, it could not be construed to create a partnership as between the parties, and was not, therefore, ultra vires as to the corporation.

¶ 4. See Partnership, vol. 38, Cent. Dig. §§ 3, 15, 39, 75.

6. CONTRACTS—LEGALITY—AGREEMENT IN RESTRAINT OF TRADE.

A contract between two mercantile houses engaged in the same line of business, by which each acquires an interest in the gross profits made by the other, is not on its face illegal, as tending to create a monopoly, and void as against public policy.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

This is a bill filed to obtain an accounting under a contract between the complainants, comprising a firm engaged in business in the city of New York under the name and style of Palm, Fechteler & Co., and the defendant, a corporation organized under the law of Ohio, and doing business in Cincinnati under the corporate name of Palm Bros. & Co. This contract bears date of February 17, 1899, but took effect from and after January 1, 1899, and was for a term of 12 years. The important features are as follows:

"Now, therefore: This agreement made between the firm of Palm, Fechteler & Co., of New York, N. Y., Casper Fechteler, Frank Fechteler, P. Emilie Moller and Pauline Moller, copartners of said firm, parties of the first part, and the Palm Brothers & Company, of Cincinnati, Ohio, a corporation organized under the laws of the State of Ohio, party of the second part, witnesseth as follows:

"First. Said parties of the first part, for and in consideration of the agreements and covenants hereinafter mentioned to be performed by said party of the second part, and with a view of increasing the business and gains of the parties of the first part, agrees and covenants with the said party of the second part to sell, furnish and supply to said party of the second part at the actual cost price, during the continuance of this contract, all such transfer and silk ornaments, special designs and decalcomania goods, as said party of the second part may choose to select and order; and said parties of the first part further agree and covenant with said party of the second part to pay said party of the second part, at the end of December of each year, to wit, on the 31st day of December of each and every year, during the continuance of this agreement, a sum of money equal to thirty-six per cent. of the total and entire gross profits made and realized during the whole year next preceding said day by said parties of the first part out of its entire business as manufacturers, importers and dealers in transfer and silk ornaments, special designs, decalcomania goods and painters' supplies, including a sum of money equal to thirty-six per cent. of the whole and entire gross profits made by its branch house in Chicago, Illinois, as well as any other branch houses that may now or hereafter be established; the first payment under this agreement to be made on the 31st day of December, 1899.

"And said parties of the first part covenant and agree to employ a capital of not less than one hundred thousand dollars in carrying on and prosecution of said business during the continuance of this agreement.

"Second. Said party of the second part, for and in consideration of the covenants and agreements herein agreed to be performed by said parties of the first part, and with a view of increasing the business and gains of the party of the second part, agrees and covenants with said parties of the first part to sell, furnish and supply to said parties of the first part, at the actual cost price during the continuance of this agreement, all such transfer and silk ornaments, special designs and decalcomania goods, as said parties of the first part may choose to order and select; and said party of the second part further agrees and covenants with said parties of the first part to pay said parties of the first part, at the end of each and every year, to wit, on the 31st day of December of each and every year during the continuance of this agreement, a sum equal to sixty-four per cent. of the total and entire gross profits made and realized during the whole year next preceding said day by said party of the second part out of its entire business transactions in the business defined and specified in its articles of incorporation, including the profits made by its branch houses, which may now or hereafter be established; the first payment under this agreement to be made on the 31st day of December, A. D. 1899."

The complainants' bill, among other things, charged that the defendant had endeavored to escape liability under its contract by carrying on a large business through the instrumentality of a corporation known as the Palm Letter Company; that this was a subsidiary corporation, owned, officered, and managed by the corporators of the defendant; that large sales of goods, really made by defendant to its own actual customers at a small trade discount, had been charged as sales to this Palm Letter Company at a very large trade discount; that this Palm Letter Company was in substance a mere branch or agency of the Palm Bros. & Co., and used only as a means of hiding gross profit on sales made by defendant in order to escape liability for a definite proportion of such profits to the complainants. It is charged that defendant denied liability to account for the gross sales made by this subsidiary company as sales made by itself, and, when complainants refused to assent to their contention, openly repudiated the contract, and refused to further abide by it.

To this bill the defendant corporation interposed a demurrer upon several distinct grounds. This was sustained. Thereupon an amended bill was filed, and the same demurrer again interposed. This was again sustained, and the bill dismissed.

Charles B. Wilby, for appellants.

Edward Colston, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The first ground of demurrer goes to an alleged failure of the complainants to aver performance or excuse for nonperformance of certain acts which they, under the contract, were required to do and perform before they can compel an accounting by defendant. One of these grounds was that each party should deliver to the other, on or before the close of each year, a full and itemized statement or invoice of stock on hand, of assets and liabilities, and a balance sheet of all its business transactions during the year. Another provision required the complainants to employ a capital of not less than $100,000 in the carrying on of their business. But without determining the character of these covenants, it is only necessary to say that the amended bill cured the defects complained of by the averment that "all the provisions of said contract by complainants to be performed during the year 1899 had by them been performed, and performance thereof accepted by defendant." As the bill was filed in 1900, and only sought an accounting for the business of 1899, this averment must be regarded as a sufficient averment of performance upon the part of the complainant.

2. It is also assigned as ground for demurrer that the bill does not state a case cognizable in equity. It is true that an accounting is not sought upon the technical ground of accident, fraud, mistake, or discovery. But if the remedy at law in an action for an accounting is not so complete and adequate as in equity, that alone is ground for equitable jurisdiction. Where it is evident that, under the machinery of a court of law, great difficulties would attend the statement of an account, courts of equity have a jurisdiction concurrent with courts of law. This case involves contract and mutual accounting, and the entire transactions of two large mercantile establishments

must be examined, and accounts compared. The production of books of account will be absolutely essential to the correct ascertainment of the basis upon which the amount due from one to the other shall be ascertained, and this renders essential the functions of a master. It is clearly a case where the remedy in equity is more full and adequate. Story, Eq. Juris. §§ 67, 452, 457; Gunn v. Brinkley Carworks, 66 Fed. 382, 13 C. C. A. 529; Kirby v. R. Co., 120 U. S. 130, 134, 7 Sup. Ct. 430, 30 L. Ed. 569.

3. It has also been assigned as ground for demurrer that the bill prays only for an accounting. But this, as we have seen, is, in complex cases, a distinct ground of equitable jurisdiction. There is added a prayer "for all other relief to which your orators will be entitled in equity and good conscience." It is not essential to good pleading that there shall be a prayer for any particular relief. Under a prayer for general relief, any relief appropriate to equity and proper under the facts may be prayed at the bar. Story, Eq. Pl. § 41. Lord Northington, in Manaton v. Molesworth, 1 Eden, 26, said that it was quite a common saying that "the prayer for general relief was the best prayer after the Lord's Prayer." Having taken jurisdiction upon the ground that there are complicated accounts to be stated, the court will not turn the party out in whose favor the account shall go, but will pronounce a money decree under this prayer for general relief. Waite v. O'Neil, 76 Fed. 408, 22 C. C. A. 248, 34 L. R. A. 550; Peck v. Ayers & Lord Tie Co., 116 Fed. 273, 53 C. C. A. 551.

4. The real controversy, and the ground upon which the court below mainly based its action, was that the contract sued upon was an agreement for a partnership between the complainants, who will hereafter be designated as the New York firm, and the defendant, a corporation of Ohio, and that the corporation had no power to enter into a partnership. Corporations, unless expressly authorized, have no power to enter into partnership either with each other or with individuals. The agency of each partner for the partnership is inconsistent with the management of the corporation by its stockholders through directors and officers chosen only by themselves. Mallory v. Oilworks, 86 Tenn. 598, 8 S. W. 396; 1 Morawetz on Corporations, § 421; Brice, Ultra Vires (3d Ed.) pp. 205 to 512, inc.; People v. North River Refining Co., 121 N. Y. 582, 24 N. E. 834, 9 L. R. A. 33, 18 Am. St. Rep. 843; Ex parte Liquidation of N. B. Life Association, L. R. 8 Ch. Div. 704; Geurinck v. Alcott, 66 Ohio St. 104, 63 N. E. 714. The law in Ohio under which the defendant was organized neither expressly nor by implication confers the power to enter into such a partnership agreement as will subject the corporation to the incidental control which every partner has, as the agent of the partnership, over the affairs of the firm.

5. But does the contract in suit actually create the relation of partners between the complainants and the defendant corporation, assuming the corporation to have the power to enter into such relation? The question here presented is not whether the nature of the agreement is such that liability as a partner might exist as to

third persons, but whether this contract provides for an actual partnership.

The defendant has repudiated the contract, and defends, when sued, upon the ground that it had no power to enter into a partnership agreement. To make good this defense, it must show that the contract is one for a partnership—an actual partnership—and it will not do to say that, although no actual partnership was intended or existed, it is enough to show that third persons might hold both complainants and defendants liable as partners, although in fact no such relation existed. Liability as a partner to third persons misled by appearances may sometimes arise, though no actual partnership exists. But this rests upon the doctrine of estoppel. Partnership is a fact—a fact sometimes made out, like other facts, from circumstances, as well as by direct evidence. Evidence may raise a presumption of a partnership so strong as to be conclusive when third persons are involved. And this is the case when one has held himself out as a partner to one ignorant of the actual fact. But this case presents no such question, as the rights of third persons are not involved. Indeed, it would be difficult to imagine a case of liability to third persons upon the ground of holding out, when the supposititious partnership was with a corporation incapable, as matter of law, of entering into such a relation. If the contract sued upon is not one which deprives the stockholders of the corporation of their power and duty to manage the corporate affairs, or subjects the corporation to the domination incident to the affairs of a copartnership, it is not ultra vires. It devolves, therefore. upon the defendant to establish that the contract into which it has entered is, in substance and legal effect, one of partnership.

It is not very prudent to define a partnership. Many definitions have been attempted, and Sir George Jessell, Master of the Rolls, in Pooley v. Driver, L. R. 5 Ch. Div. 459, 471, referred to the fact that no less than fifteen such definitions by different learned lawyers, no two of which he says agree, are given in the third edition of Lindley on Partnership, pp. 2, 3. Concerning these he says, "And I suppose anybody, by reading the fifteen, may get a general notion of what a partnership means."

The Supreme Court, in Meehan v. Valentine, 145 U. S. 611, 618, 12 Sup. Ct. 972, 973, 36 L. Ed. 835, has, through Mr. Justice Gray, defined a partnership. The very learned justice in that case said:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits."

All would possibly not agree that the contribution by each of "property or service" is essential.

Sir George Jessell, in Pooley v. Driver, cited above, states that under English law you can have a partner, a dormant partner, "who puts nothing in—neither capital nor skill, nor anything else."

Undoubtedly, there must be an association of two or more persons for the purpose of carrying on a trade or business or adventure together and dividing the profits. The presence or absence of cer-

tain other incidents of a partnership by special arrangement between the parties would not seem to be of the essence of the matter. Fleming v. Lay, 109 Fed. 952, 955, 48 C. C. A. 748.

There is found in some of the earlier cases a disposition to regard evidence of a participation in profits as affording so cogent a presumption of a partnership as to make one liable to third persons, though ignorant of the fact, in defiance of the positive agreement of the parties that they should not be partners. Grace v. Smith, 2 W. Black. 998; Waugh v. Carver, 2 H. Bl. 235; Berthold v. Goldsmith, 24 How. 536, 542, 16 L. Ed. 762; Wood v. Vallette, 7 Ohio St. 172.

This rule—that by operation of law one was liable as a partner to third persons, irrespective of the actual agreement between the parties, or of any misleading, seems to have been rested upon the theory that one who shares in the profits must also share in the losses and stand liable for the debts. The reason given in Waugh v. Carver, 2 H. Bl. 235, for this, is that in taking part of the profits he takes a part of the fund which the creditor relies upon for payment. This reasoning has been repeated in many cases following Waugh v. Carver. But as Judge Story observes, this reasoning is utterly fallacious, inasmuch as profits do not exist until creditors are paid or provided for, as well as because creditors rely upon the entire assets, and not the net profits. Story, Part. 36, and note 3.

If the presumption arising from evidence of a participation in profits had been as rigid as some of the judges have supposed, it was possible from that circumstance alone to fasten liability in the face of other evidence showing that in actual fact no partnership existed. But as this doctrine was based only upon a presumption of the fact of partnership from evidence of a participation in profits, it has never been regarded as an irrebuttable presumption, and its cogency as evidence of a partnership has been much relaxed by subsequent cases in which a wider view of the subject has been taken. The most that can be said of it, as the law is now understood, is that a participation in profits is strong evidence of a partnership, and enough, unless explained by other circumstances showing a different relation. Cox v. Hickman, 8 H. L. Cases, 268, 304, 306, 312, 313; March & Co. v. Court of Wards, L. R. 4 P. C. 419, 435; In re Eng. & Irish Soc., 1 Hem. & Mil. 85; Ross v. Perkins, L. R. 20 Eq. 331, 335; Pooley v. Driver, L. R. 5 Ch. Div. 458, 476, 479.

While the reference to agency as a test of partnership has not been accepted with much favor by the courts of either England or the United States, inasmuch as an agency is a consequence, and not a cause, of partnership, made so prominent in Cox v. Hickman, the case has otherwise met with general approval as a more reasonable statement of the inferences deducible from evidence of a participation in profits. Davis v. Patrick, 122 U. S. 138, 151, 7 Sup. Ct. 1102, 30 L. Ed. 1090; Story on Partnership, §§ 38, 49, notes; Meehan v. Valentine, 145 U. S. 611, 620, 623, 12 Sup. Ct. 972, 36 L. Ed. 835; Harvey v. Childs, 28 Ohio St. 319, 22 Am. Rep. 387.

If participation in profits is only evidence of a partnership, and subject to be explained even as to third persons, it must follow

that the intent and agreement of the parties themselves should govern in all cases, and that the same rule should apply in favor of third persons, unless there has been conduct calculated to deceive, which applies between the parties themselves. This was the view taken by Judge Story before Cox v. Hickman and Meehan v. Valentine, as shown in his forty-ninth section of his work on Partnership, where he says:

"In short, the true rule, ex æquo et bono, would seem to be that the agreement and intention of the parties themselves should govern all the cases. If they intended a partnership in the capital stock or in the profits, or in both, then that the same rule should apply in favor of third persons, even if the agreement were unknown to them. And on the other hand, if no such partnership were intended between the parties, then that there should be none as to third persons, unless where the parties had held themselves out as partners to the public, or their conduct operated as a fraud or deceit upon third persons. It is upon this foundation that the decisions rest which affirm the truth and correctness of the distinction already considered as a qualification of the more general doctrine contended for."

Nor is there anything in conflict with this conclusion in the summary of the law in Meehan v. Valentine, 145 U. S. 611, 623, 12 Sup. Ct. 972, 975, 36 L. Ed. 835, where, speaking by Justice Gray, it is said:

"In the present state of the law upon this subject, it may perhaps be doubted whether any more precise general rule can be laid down than, as indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow that the acts of one in conducting the partnership business are the acts of all; that each is agent for the firm and for the other partners; that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts; that all are liable as partners upon contracts made by any of them with third persons within the scope of the partnership business; and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership."

The intent to be partners is made out when we find a business carried on for the joint benefit of two or more persons, with an agreement for a mutual participation in profits, as profits. The fact that one of the incidents of a partnership—mutual liability for debts—has been eliminated by agreement does not change the essential nature of the relation, which is nevertheless that of a partnership. Fleming v. Lay, 109 Fed. 952, 955, 956, 48 C. C. A. 748. Such a stipulation, though good between the parties, will not be valid as against third persons. This view reconciles the inconsistency of holding that a partnership exists in defiance of the agreement and intention of the parties, as exhibited in some of the cases which seem to sanction the notion that there may be a partnership as to third persons, though there had been no conduct to create an estoppel, and none between the parties themselves.

But in every phase of the question as to the cogency of evidence of a participation in profits it has been understood that the person sought to be charged as a partner must have an interest in profits,

as profits. Thus it is said by Judge Story in section 49 of his work upon Partnership, adopting the view of Collier upon Partnerships, "that in order to constitute a communion of profits between the parties, which shall make them partners, the interest in the profits must be mutual; that is, each person must have a specific interest in the profits as a principal trader." Meehan v. Valentine, 145 U. S. 611, 619, 623, 12 Sup. Ct. 972, 36 L. Ed. 835. Hence it always has been the rule that if you could show that the participation in profits was not a sharing in profits as a principal—in profits as profits of a joint business—but under an agreement by which a sum was to be received which should be equal to a definite proportion of the profits as a compensation for services or rent, or money advanced as a loan, there will be no liability as a partner. Such an arrangement would contradict the notion of a partnership, for there would be no participation in profits as a principal, no receipt of profits as profits. Upon the contrary, the relation of creditor would be made out; the amount of the debt being a sum of money estimated by a certain proportion of the profits, as a mere measure or yardstick. "The way in which the profits are to be participated in is the essence of the whole matter." Cotton, L. J., in Ex parte Tennant, 6 Ch. Div. 303, 316. This definition of sharing in profits as evidence of a partnership is supported by all the cases, and we need cite but a few of the more recent and controlling: Berthold v. Goldsmith, 24 How. 536, 542, 543, 16 L. Ed. 762; Meehan v. Valentine, 145 U. S. 611, 619, 12 Sup. Ct. 972, 36 L. Ed. 835; Story, Part. §§ 33, 34; Burnett v. Snyder, 81 N. Y. 550, 37 Am. Rep. 527.

Applying these principles, the case at bar is of easy solution. The contract in suit does not in terms provide for a partnership, nor contemplate any of the incidents of a partnership, unless the provision in reference to the participation of each in the profits of the business of the other establishes the relation and liability of partners. But it is very clear that the provision for a participation in profits does not contemplate any sharing in profits as a principal or division of profits, as profits. "Profit" implies, without more, the gain resulting from the employment of capital—the excess of receipts over expenditure. Black's Law Dictionary, citing Connolly v. Davidson, 15 Minn. 519, 530 (Gil. 428), 2 Am. Rep. 154; Story on Part. § 36, note 3.

The old cases drew a distinction between net profits and gross profits. In discussing the kind of participation in profits which operated to create the relation of partners, it is said that:

"The true meaning of the language, an 'interest in profits, as profits,' seems to be that the party is to participate, indirectly at least, in the losses, as well as in the profits, or, in other words, that he is to share in the net profits, and not in the gross profits. If he is to share in the net profits, which supposes him to have a participation of profit and loss, that will constitute him a partner; if in the gross profits, then it will be otherwise." Story on Part. §§ 34, 42, and cases cited.

Under the contract in suit, the sharing was to be not in the net gains or profits made by the one party in the business carried on by the other, but in the gross profits. That net profits were not meant, they make plain by a definition found in the fifth paragraph, where

it is stated, in substance, that "gross profit" means the aggregate sales made, whether collected or not, after deducting the cost, import duties, and carriage, and that "no other charges, expenses or losses of whatever kind or nature shall be deducted from said gross profits." Thus the participation was in the gross amount of sales after the deductions above mentioned were made. The losses in bad debts and the cost of business might consume the margin between the cost and sale price, and yet the complainants would be entitled to receive a certain per cent. of the gross profit, though the business had made no actual gains, or had even made a loss. There was, then, no sharing in losses, and, under the old cases, no participation in profits, as profits, such as would, without more, raise a presumption of partnership.

But the absence of any intent or purpose to form a partnership is made plain by a wider view of the case:

(a) The covenant of the complainants, composing the New York firm, is that they will "sell, furnish and supply" to the Cincinnati corporation "all such transfer and silk ornaments, special designs and decalcomania goods" as may be ordered, etc.

(b) The covenant of the second party, the Cincinnati company, inferably engaged in the same limited and special sort of business, is that it will also "sell, furnish and supply the New York firm all such transfer and silk ornaments, special designs and decalcomania goods" as said parties may choose and order.

(c) Each agrees that the goods so furnished the other shall be at actual cost price.

(d) But as a further consideration for this mutual right of picking and choosing from the stock and designs of the other, the contracting parties agree that, in addition to paying the actual first cost of goods bought by one from the other, each shall pay "a sum of money" to the other at the end of each year which shall be "equal" to an agreed per cent. "of the total and entire gross profits made and realized out of its entire business as a manufacturer, importer and dealer in transfer and silk ornaments, special designs, decalcomania goods and painters' supplies," including the business of branch houses, etc. The "sum of money" to be paid by the New York firm is to be equal to 36 per cent. of its gross sales, while the "sum of money" received from the Cincinnati company is to equal 64 per cent. of the gross sales of the latter. This difference was doubtless based upon the estimated greater value of the business of the New York firm.

Thus, though there is to be a sharing in gross profits, it is not to be a participation in profits, as profits, or as a principal in trade. Upon the contrary, the plain purpose is that each, in consideration of the privilege of picking and choosing the goods or designs made or imported by the other, agrees to pay the actual cost of such goods so selected and furnished, and also "to pay" the other at the end of each year "a sum of money equal to" a definite per cent. of the entire gross sales of the party making the payment, less only the actual cost and carriage of such goods. It is an agreement to pay, not to divide as principals would do, but to pay a sum of money

"equal to" (that is, measured or estimated by) a certain proportion of the gross profits. It is evident from these considerations that the character in which the one party would receive a proportion of the gross profit realized from the business of the other would be that of a creditor, rather than that of a principal trader.

Unsupported as the claim of a partnership is by any provisions giving either party the slightest control of the business of the other, or any indication that the plan is a mere scheme or device to carry on trade as partners without subjecting themselves to the incidents and liabilities of such an arrangement, we can but reach the conclusion that the learned judge below erred in the view he took of the contract.

6. Another ground of demurrer is that the contract is in restraint of trade and void as against public policy. It is difficult to see upon the face of the contract in suit any purpose to illegally restrain trade or commerce, bring about a monopoly, or enhance prices illegally, either under the Ohio statute (93 Ohio Laws, 143) or at the common law. It has never yet been supposed that, if one mercantile house or manufacturing concern obtained an interest in the other, such a contract, irrespective of all actual or probable effect upon the public, would be a contract void as tending to monopoly. It may be that these two establishments were the sole makers or dealers in the goods they dealt in, and that an enhancement of prices would therefore follow, to the public detriment. But we can know nothing about the importance of the dealing between these concerns, except that which appears upon the face of the bill and its exhibit—the contract sued upon. No such evils as suggested are borne out in any degree by that which is before us upon this ground of demurrer.

Decree dismissing the bill reversed, with directions to remand for an answer.