MANSON et al. v. WILLIAMS.

(Circuit Court of Appeals, First Circuit. May 16, 1907.)

No. 688.

1. BANKRUPTCY—ORDER OF ADJUDICATION—CONCLUSIVENESS OF FINDINGS.

Where a petition in involuntary bankruptcy alleged that the two defendants owned a stock of goods as partners, and that therefore a partnership existed which it was prayed might be adjudged a bankrupt, and such adjudication was made, it was a conclusive determination of the owner-

ship of the stock of goods as between the parties to the proceeding, but could not bind the trustees in bankruptcy of one of the alleged partners, who had taken possession of and sold the goods as assets of his individual estate, and who were not permitted to become parties to the partnership proceeding.

2. SAME—PARTNERSHIP—EVIDENCE TO ESTABLISH.

The owner of the stock of goods in a store turned the same over to his brother, who personally conducted the business thereafter under a company name, which was publicly used in all transactions relative to the business. It was originally the intention to form a corporation to own the business, the most of the stock to be issued in the first instance to the brother who owned the goods, but such intention was never carried out. *Held*, that there was a partnership in fact between the brothers in the business, which might be adjudged a bankrupt, and which was the owner of the property and assets of the business.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 51; vol. 38, Partnership, §§ 1–38.]

Appeal from the District Court of the United States for the District of Maine.

For opinion below, see 148 Fed. 305.

John W. Manson (Harry R. Coolidge, on the brief), for appellants.
John S. Williams (Albert S. Woodman, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. The controversy in this case arose as follows: On the 14th day of July, 1904, Henry Hudson filed a voluntary petition in bankruptcy, on which he was adjudicated a bankrupt, and John W. Manson, Albert W. Chapin, and Freeman D. Dearth were duly appointed and qualified as trustees of his estate on the 23d day of August. Subsequently, on October 22d of the same year, a petition was filed by creditors against Henry Hudson and James Hudson, alleging that they were copartners doing business under the style of the Hudson Clothing Company, and praying that they be adjudged bankrupts as such copartners. Henry Hudson and James Hudson were brothers. On the 9th day of the succeeding November a denial of bankruptcy was filed by the trustees of the estate of Henry Hudson. On November 21st Henry and James each filed their answers denying the allegations of the petition. On November 22d a further answer of the trustees was filed. On the 24th day of the succeeding January an order was made as follows, "Case to stand for hearing on question of adjudication on petition and answers of James and Henry Hudson"; and a hearing was had on June 13, 1905, by the District Court, as the result of which James and Henry were adjudged bankrupts, as copartners under the style of the Hudson Clothing Company. Subsequently a petition for a rehearing was filed and denied.

No doubt on the creditors' petition the real controversy considered and passed on was whether there was any such copartnership as the petition alleged. There was nothing, however, to qualify the order of January 24th that the case was to stand for hearing on the creditors' petition and the answers of James Hudson and Henry Hudson; and it is thus apparent from the record in the District Court that the

trustees of the estate of Henry Hudson were not regarded as being in court with reference thereto.

At the time Henry Hudson filed his petition in bankruptcy, a stock of general merchandise, such as is customary in country stores, was in the control of himself or his brother James, or of both of them. This stock was taken possession of by the trustees in bankruptcy of Henry Hudson, and sold by them, and the present controversy arises out of a claim of John S. Williams, who was appointed trustee of the alleged bankrupt copartnership, to the proceeds of the sale on the ground that the merchandise belonged to the Hudson Clothing Company. The case was heard by the learned judge of the District Court, where the bankruptcy proceedings were pending, and decided by him in favor of Williams as trustee, whereupon the trustees of the estate of Henry Hudson appealed to us.

One feature of this case which we cannot pass by is that the questions of the existence of a copartnership and of the title to the stock of goods are identical; that is to say, if the stock of goods was the individual property of Henry Hudson, there was no copartnership, and, if there was no copartnership, the stock was his individual property. Therefore the substance of a like issue to that before us was adjudicated on the creditors' petition to have Henry Hudson and James Hudson adjudged bankrupts as copartners. The question at once arises whether the issue is not already concluded. It might have been if the trustees of Henry Hudson's individual estate had been allowed to intervene and become parties to the hearings on the creditors' petition. Of course, so far as ordinary bankruptcy proceedings are concerned, the adjudication of the District Court on that petition determined the status of the Hudson Clothing Company; but, as the trustees who have appealed to us had not been included as parties thereto, as we have explained, the fact of the status of the Hudson Clothing Company for ordinary purposes cannot affect the alleged rights of the appellants, or bar these proceedings.

We agree with the conclusion of the learned judge of the District Court, and approve his observations so far as he has expressed himself, with reference to the issues before us. 148 Fed. 305. Probably, with regard to the adjudication on the creditors' petition, he had orally explained himself fully, so that on the issue now before us he did not deem it necessary to express himself except in a general way; and, as the questions involved are to a certain extent novel, we conclude that our opinion in reference thereto had better explain itself.

We will observe, however, that the learned judge of the District Court found that there was a copartnership in fact between the two brothers under the style of the Hudson Clothing Company. He did not rest his conclusion in any way on any hypothesis of a copartnership by estoppel in the strict sense of the expression. This is important, because we regard the law as settled that, in bankruptcy proceedings involving a copartnership, the copartnership is, ordinarily, to be regarded as a true entity, precisely as the individual partners are. Various incidental reasons are given for this, the principal one of which is that otherwise there would be two classes of creditors whose equities otherwise are equal, one of which classes would share

in the proceeds of certain property on the ground that two or more persons were estopped as to them from denying a copartnership, while other creditors who had contributed to the same enterprise would be left to what might remain of the property involved in the enterprise after the first class were paid, or to one or more individual estates. The fundamental reason, however, is that all through the various statutes of bankruptcy, whether in the United States or in England, which deal with copartnerships, the individuality and the entity of the copartnership are recognized to the same extent as the individuality and the entity of the several persons involved therein. The entire rule on this topic, so far as we have occasion to refer to it, is well deduced from Ex parte Sheen, 6 Ch. D. (1877), 235, to which case we will return again.

In view of these suggestions, however, we will say that there is in the record a large amount of correspondence, some of which may tend to show a copartnership by estoppel in favor of numerous creditors, and some of which might raise an indication that there was in fact no partnership. All of it, however, can be passed by as having no clear tendency in any direction so far as the issue before us is concerned, without any further comment in reference thereto. We regard the case as easily disposed of on the theory of a real copartnership on the facts stated by Mr. Henry Hudson, as follows:

"For some time prior to April, 1902, I have been equitable mortgagee, or in fact owning the stock of goods in the store conducted by J. A. Rand, in Guilford Village, Me. Mr. George F. Newbegin, who then lived in Guilford, had an equitable interest in the goods. In the latter part of April, 1902, I deemed it for my interest to take said goods. I communicated with Mr. George F. Newbegin, and Mr. Newbegin and J. A. Rand took the account of stock as a basis of settlement between Rand and Newbegin. After this account of stock was taken, Mr. Newbegin turned over to me the stock of goods as my own. I had these goods and desired to sell the goods. Immediately after this transaction was closed with Mr. Newbegin, I had two telegrams to go to Bangor, where my brother, James Hudson, was conducting a grocery business. After I got to Bangor, I deemed it for his interest that he should close out his grocery business at Bangor, and for him I did close out the business. I told him that I had a stock of goods at Guilford, and that he could go to Guilford and go into business there in the same store where the business had been carried on by J. A. Rand, and with this stock of goods he came to Guilford and went into the store. He had the original account of stock which had been taken of the goods and examined it. I said to him that I would form a corporation; that it would take three of us: that myself and he, with a third party, would make up the corporation, and he could have all of the goods; and that it should be his business, but the stock, when issued, I should hold, and, as he could pay me, he was to pay me for the stock of the corporation, and it was to be turned over to me after the corporation was formed. I would transfer to the corporation the goods, so that the corporation could hold the goods. It was talked between him and myself that my aunt, Martha Martin, should be the third party to make up the corporation; that he could hold some of the stock, and Mrs. Martin should have enough so as to make her eligible as a party to the corporation. I think it was about the 6th of June that he went into the store to do business. Some time in the month of June I did draw up an agreement under the statute to form a corporation, and also wrote a certificate as required by law. Nothing further was done with these two documents by me. They remained in my office. I never showed them to my brother, James Hudson, or to Mrs. Martha Martin. I did not complete the organization at that time on account of the condition of my brother. I thought from week to week that circumstances might change, and then I would complete the organization. So that,

this was allowed to go from time to time until August, 1903, when my brother was away from the store for about six weeks, and returned the latter part of September or first of October, and after that pressing business matters of my own caused me to neglect to do anything further in regard to completing the organization of the corporation. My brother never saw the documents that I had drawn up. I never transferred to any one the title of these goods which I had from Mr. Newbegin. My brother was in the store and conducted the business entirely. He did not consult with me at all in regard to the management of the business. Whatever goods I took from the store I purchased and bought, principally at prices at the time which he gave me, and practically paid for everything that I took from the store, and so far as I can recollect I never had any goods charged that I took from the store. I made purchases there the same as I purchased goods at other stores. I never had anything from the store but what was paid for.

"There never was any talk between us about forming a partnership or that I should ever receive any profit from the business. I was to hold the stock of the corporation, when formed, only as security, and to be turned over to him as his property as he paid for it. I did what I did for the express purpose of having him go into business at Guilford to carry the business on as practically for himself. The idea of a corporation was that he could hold it and manage it best as his own, and I still be in a measure protected by holding the stock. I cannot state the time when I first knew of the name of the Hudson Clothing Company. It must have been some time in the summer. I was not consulted in so far as the name was concerned. My first knowledge in regard to the name was obtained, not from my brother, but, I think, from seeing the advertisement which he put into the newspaper or on the boards he put out upon the highway or upon the corner of the store. We never had any talk whatever in regard to the use of the name, or in regard to the conducting on of the business. I advanced or let him have money from time to time to pay, as he said, bills that he had contracted. I also paid notes that he had given; these notes having been brought to me and indorsed by me for him. The amount which I paid on account of debts which he had contracted after he went into the store aggregate about $5,000. These sums of money which I let him have I charged upon my books under the name of Hudson Clothing Company, except in some few instances. These instances I am not now able to state the dates or exact amounts. Not having seen my books for some time to make examination, I used the name of the Hudson Clothing Company simply as an identification to keep the account by itself. I did indorse for him, from time to time, notes given to persons, firms, or corporations from whom he had purchased goods."

Affairs continued in the manner thus described until Henry Hudson filed his petition in bankruptcy; that is, until July, 1904, being more than two years, except that the name Hudson Clothing Company was publicly exhibited by a sign on the store where the business was transacted; that the bills received and rendered carried that title; and that, beginning with September, 1902, the account with the First National Bank of Guilford, at which the deposits of the business were made, which until that time had been kept in the name of James Hudson, was changed to Hudson Clothing Company, and checks were subsequently drawn as the checks of the Hudson Clothing Company. There was thus a general holding out to the public to that extent. Although for the purpose of maintaining merely an estoppel in the strict sense of the word, this cannot be availed of, as we have shown, it is available on the question of the existence of a copartnership in fact, because, as this all occurred in the small town in which Henry Hudson lived, and as he admitted that he knew the name Hudson Clothing Company had been used, the learned judge of the District Court had a right to find as a fact that he knew, or ought to have known, the extent to which that had gone. Bearing in mind the

153 F.—34

fact that all agreements as to which no particular form is demanded may either be proven as made expressly or proven as made by implication, the fact of this public use of the name, apparently that of a copartnership, must be given its due effect.

At this point we return to Ex parte Sheen, 6 Ch. D. (1877) 235. It is true that it was held by the Court of Appeals that the mere fact that one who has held himself out to a small number of creditors as a copartner with a trader is not barred from proving against the trader, whatever may be his liabilities to the few persons with reference to whom he may be estopped; but Lord Justice James, in his opinion, at page 237, observes that there was no actual copartnership in the case, and "no ostensible partnership, no holding out to the world, that is, to creditors generally, that there was a partnership, * * * so as to make a joint estate." This fairly implies that a holding out such as we have here may, at least to some extent, support a finding that there was a copartnership by implied agreement, or that the parties had drifted into the relationship of copartners in fact. This subject is treated sufficiently in Williams on Bankruptcy Practice (8th Ed.) 166, 167, where there is a discussion of reputed ownership, which, of course, does not exist in the United States to any definite extent, and also of an ostensible copartnership of the kind referred to by Lord Justice James, with some examination of the authorities on both these topics, which it is not necessary for us to follow out.

It is plain that the original arrangement between the two brothers did not contemplate a copartnership, but simply an intrusting by Henry to James of property belonging to Henry, to enable James to work it up for his own benefit. True it is that, in regard to the proposed corporation, the trustees of the estate of Henry Hudson cite Fay v. Noble, 7 Cush. (Mass.) 188, Bank v. Almy, 117 Mass. 476, and Ward v. Brigham, 127 Mass. 24, to the point that parties who join in the contemplated organization of a corporation do not thereby become copartners. Two of these cases relate to the general proposition that members of a de facto corporation which is defectively organized are not copartners, and the other to peculiar circumstances with regard to the relations among themselves of partners contemplating a corporation; the peculiar circumstances establishing no general principle. None are at all in point here. The intention to form a corporation slumbered so thoroughly, and so long, that it is of no effect.

Probably the best definition of partnership is that found in the partnership act of 1890 (St. 53 & 54 Vict. c. 39), which reads as follows: "Partnership is the relation which subsists between persons carrying on a business in common, with a view of profit." It is necessary to note the significance of the words "carrying on a business," which implies a relation entirely different from the enforced relation of tenants in common, as the owners of a ship or of a house, who must either let the property lie idle or keep it in some way occupied or used, deriving a return from such occupation or use. Various illustrations of the force of this distinction will be found in Pollock's notes to the act referred to, entitled "A Digest

of the Law of Partnership," (5th Ed.) 2, 3. Mr. Justice Gray, in Meehan v. Valentine, 145 U. S. 611, 618, 12 Sup. Ct. 972, 36 L. Ed. 835, gives a definition almost precisely like that which we have cited from the partnership act, as follows:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits."

The difficulty with definitions, like some of those brought forward by the trustees of the Henry Hudson estate, is that they put the agreement to share profits to the forefront. The right to share profits is, of course, an element in a true copartnership; but, when it is said that a copartnership involves an agreement to share profits, it goes beyond the legislative definition, and that of Mr. Justice Gray which we have quoted, and unnecessarily beyond them. The right to share profits, of course, exists; but the right may arise without anything in the nature of an express agreement, indeed, without anything in the nature of an implied one. The right to share profits is an indication of the existence of a copartnership, but it may result from an agreement to that effect, or it may flow out of the relationship which exists between the parties. It is true that the present case is embarrassed by the fact that, in the absence of any agreement as to the profits, in connection with the further fact that Henry Hudson contributed only assets, while James Hudson contributed only personal services, it may be difficult to determine how profits would have been shared, and therefore it is plausible to suggest that there could have been no profits, and consequently no partnership. Nevertheless, both of these details are met by Paul v. Cullum, 132 U. S. 539, 550, 10 Sup. Ct. 151, 33 L. Ed. 430, where it was observed that, in the absence of any evidence showing a different intention, partners would be held to share equally both profits and losses.

The result is that, whatever may have been the intention when Henry Hudson put the property into the hands of James Hudson to be managed by him, those gentlemen and the circumstances of the business drifted entirely away from it, and the relations between them must be determined by what afterwards ensued. Those relations embraced all the elements necessarily included in the definitions given by the partnership act and by Mr. Justice Gray; and it is impossible to characterize the substantial result except as has been done by the learned judge of the District Court.

The question of interest passed on by the learned judge of the District Court was fully explained by us in Hutchinson v. Otis, 115 Fed. 937, 53 C. C. A. 419, in an opinion passed down on May 22, 1902, which is the same case reported as Hutchinson v. Otis, 190 U. S. 552, 23 Sup. Ct. 778, 47 L. Ed. 1179. His decision in regard thereto conformed to the rule stated by us, and was undoubtedly correct.

The decree of the District Court is affirmed, and the appellee recovers his costs of appeal against the appellants as trustees.