### BROOKS et al. v. SMITH et al.

(Circuit Court of Appeals, First Circuit. June 4, 1923.)

No. 1610.

1. Receivers ⊚⟹209—Local creditors may enforce claims against local assets in hands of ancillary receivers.

Creditors of a partnership having branches doing business in different states, whose claims arose out of transactions with the branch in their state, where there are also assets, and where some of the partners reside, cannot be compelled to go to a foreign jurisdiction to assert their rights,

but have the right to subject local assets to their claims, through the courts of the state, or through a federal court which has possession of such assets through ancillary receivers.

2. **Receivers ☞209—Rights of local creditors on transfer of assets from ancillary to primary jurisdiction stated.**

There is no inflexible rule of procedure, either to transmit assets and remit creditors from the ancillary to the primary jurisdiction, or to refuse such course, but creditors have a right to intervene to have locally determined the general financial condition of the receivership estates, both in the original and in the ancillary jurisdiction, and the presumption is that local assets should not be put beyond the reach of local creditors until their rights have been secured in some effective fashion.

3. **Evidence ☞397(5)—Nature of partnership determined by written contract of partnership.**

Where partnership agreements are in writing, they speak for themselves, and extrinsic evidence is incompetent to determine their construction and effect.

4. **Partnership ☞20—Agency inter sese and profit sharing important in determining "partnership" contract.**

Agency inter sese and profit sharing are at least important factors in determining whether a contract is one of "partnership."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Partnership.]

5. **Banks and banking ☞24—Contract held not to admit new partners to firm, but to create separate partnership.**

A written agreement by which the members of a partnership engaged in the general banking business in New York and other places, as first parties, admitted second parties "into general partnership with them in the said banking business upon the following terms and conditions," which were that second parties should have charge of the business in Boston, all of which should be subject to their approval, that they should each receive a guaranteed salary and in addition a share of the profits of the Boston business after payment of such salaries, but that the name and capital of the firm should remain the property of first parties, *held* not to make second parties general members of the partnership, with the right to act for the firm in respect of its business in New York, or elsewhere than Boston, but that it created a separate partnership, relating only to the Boston business.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Suit in equity by the Beaverboard Company against James Imbrie and others, partners as Imbrie & Co., in which Theodore G. Smith and another were appointed receivers. From an order dismissing the petition in intervention of Edwin D. Brooks and others, they appeal. Reversed.

J. Butler Studley, of Boston, Mass. (Dunbar, Nutter & McClennen, of Boston, Mass., on the brief), for appellants.

Robert L. Raymond, of Boston, Mass., for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. On March 3, 1921, the Beaverboard Company, a Delaware corporation, filed in the District Court for the Southern District of New York a bill in equity against James Imbrie,

William Morris Imbrie, Roswell C. Tripp, Charles G. West, Jr., David T. Wells, of New York or New Jersey, and Waldo S. Kendall and William Minot, of Massachusetts, described as copartners doing business as bankers and dealers in securities under the firm name of Imbrie & Co., alleging that the plaintiff was a creditor to an amount in excess of $5,000, and praying the appointment of a receiver, and an injunction against suits by other creditors, on the ground that the defendants were embarrassed by lack of cash and liquid capital. Frederico Lage is also referred to as having been a partner at the time when the plaintiff's debt is alleged to have been incurred, and rights are sought to be reserved against said Lage. Federal jurisdiction was grounded on diversity of citizenship. The bill alleges that Imbrie & Co., with their principal office in New York City, had assets exceeding $13,500,000, and liabilities of about $11,810,000, so that, if liquidated in ordinary course, the concern would be solvent, with net assets of about $1,740,000. By counsel the defendants on the same day appeared and admitted the allegations of the bill to be true, and assented to the appointment of receivers. The court forthwith, without notice to creditors, appointed Theodore G. Smith and John B. Johnston, with very broad powers of administration, including the power to apply to the courts of other jurisdictions for the appointment of ancillary receivers.

On March 7, 1921, the said receivers applied to the District Court for Massachusetts, reciting the proceedings in New York, alleging that Imbrie & Co. had a branch office in Boston, with assets "worth in excess of secured and unsecured debts in the neighborhood of about $5,000." This allegation seems to treat the Boston business as a separate concern. Here, as in New York, the defendants appeared by counsel, admitted the allegations, and joined in the prayer for relief. The District Court thereupon appointed the New York receivers, together with Frederick S. Goodwin, of Dover, Mass., to be ancillary receivers in the Massachusetts district, enjoining all suits pending or contemplated by creditors.

On April 25, 1921, the appellant Edwin G. Brooks filed, in behalf of himself and all other persons in like situation, a petition alleging that he had a claim upwards of $20,000 as assignee, against James Imbrie, William Morris Imbrie, Frederico Lage, Roswell C. Tripp, Charles G. West, Jr., Waldo S. Kendall, and William Minot, copartners doing business under the name of Imbrie & Co., on account of transactions at the Boston office of said firm.

The partnership thus described includes Frederico Lage and leaves out David T. Wells, described as a partner in the bills filed in the District Courts in both New York and Massachusetts. In this petition, Brooks alleges that ancillary receivers had been appointed "for said above-named partnership;" but he also alleges that, under various agreements referred to, a partnership was constituted under the name of Imbrie & Co., doing business in New York, Chicago, and elsewhere than New England and Eastern Canada, consisting of James Imbrie, William Morris Imbrie, Frederico Lage, Roswell C. Tripp, Charles G. West, Jr., John F. Trow, C. A. Dana, and David T. Wells; that under another agreement dated January 1, 1919, another partnership was

constituted, consisting of James Imbrie, William Morris Imbrie, Frederico Lage, Roswell C. Tripp, Charles G. West, Jr., Waldo S. Kendall, and William Minot (referred to in the proceedings and herein as the Boston partnership), organized to carry on business in the New England States and in Canada east of Ontario; that separate books of account were kept of the Boston partnership and of the New York partnership; and that the two concerns were in all respects carried on as separate and distinct partnerships, with the alleged legal result that the assets of the Boston partnership ought to be used for the purpose of satisfying the creditors of the Boston partnership and ought not to be removed from this jurisdiction, as, on information and belief, the petitioner alleged the ancillary receivers intended to do. The prayers were:

(1) That the ancillary receivers be directed to retain within the jurisdiction of the District Court in the Massachusetts District all the assets in their possession until further order of the court; and

(2) That said receivers retain for distribution among the persons dealing with the 7 persons named in the agreement of January 1, 1919, all assets attributable to the Boston business or pay over such assets to distinct and independent receivers for distribution to those found entitled thereto.

About 20 other alleged creditors subsequently joined in the petition. The District Court allowed these petitioners to intervene. It is apparently assumed throughout the record that they are creditors of Imbrie & Co.; but there is nowhere in the record any finding on that point.

To this intervening petition the ancillary receivers filed on June 30, 1921, a long answer. They denied information sufficient to form a belief as to the allegation that the interveners were creditors. They alleged that in the proceedings in New York the claimants were required to assert their claims on or before May 8, 1921, and that a special master had been appointed to consider all claims; that the court in New York had assumed full, complete, and exclusive jurisdiction of the property of defendants, which property the ancillary receivers declared to be within the exclusive jurisdiction of the New York court, "with exclusive right and power to determine all questions and claims affecting said property and all interests therein, with full and exclusive right to marshal said claims and said interests, and to fully liquidate, sell, and determine the character and extent of the title, custody, and possession of such receivers and of all persons whatsoever in such property," etc.; that the court in Massachusetts "in appointing ancillary receivers herein recognized the right of primary jurisdiction in said District Court for the Southern District of New York, and appointed its ancillary receivers to act in subordination of said main order of administration of the United States District Court for the Southern District of New York."

On the interveners' motion, the "issues in said intervening petition" were referred to a special master, "to hear the parties and their evidence and report to the court his findings of fact and his conclusions of law and fact thereon." In his report, the master dealt only with

the problem as to whether the business carried on in Boston under the name of Imbrie & Co. was a branch of a single partnership of Imbrie & Co., which had its principal office in New York City and admittedly had various branch offices in Chicago, Milwaukee, and other cities, or whether the Boston concern was a separate and distinct partnership. The master made no finding as to whether Imbrie & Co., however constituted, is solvent or insolvent, or what its assets and liabilities are. Nor is there any finding as to the assets and liabilities of the Boston concern, whether considered as a branch or as a separate copartnership.

The report deals largely with agreements other than the agreement of January 1, 1919. Against objection by the interveners, the master admitted extrinsic evidence as to what the parties thought the legal effect of their agreements to be, but at the end of the report ruled that he would "have given the same construction to the agreement of January 1, 1919, if the extrinsic evidence had been excluded." His general conclusion was that there was only one partnership of Imbrie & Co., from which he deduced that the intervening petitioners were entitled to no relief in the District Court of Massachusetts. The District Judge confirmed the master's report and ordered the interveners' petition to be dismissed, with costs to the ancillary receivers in the sum of $611.05. The interveners appealed to this court.

We deal with the case as it is presented, assuming, without deciding, that the receivership proceedings in New York were valid. But compare Lion, etc., Co. v. Karatz, 43 Sup. Ct. 480, 67 L. Ed. —— (April 23, 1923), and cases cited.

The implication of the decree below is that the petitioners, who are apparently assumed, although not found, to have valid claims of $30,000 to $40,000 against a partnership called Imbrie & Co., two of the partners of which firm are admittedly Massachusetts citizens, are enjoined from proceeding against partnership assets in Massachusetts; what rights, if any, they are considered to have against the individual partners or their estates is not indicated. The situation is puzzling and anomalous. The plan apparently is for the ancillary receivers to transmit all the assets of the firm to the receivers in New York, remitting all creditors in New England and eastern Canada to New York to prove their claims, assuming that the time limit for proof, alleged to have been originally fixed as May 8, 1921, has not already finally expired. But there is nothing in the present record indicating that the court in the Southern district will in any way now recognize the rights of the interveners.

[1] We are unable to adopt this view of the rights of local creditors, even if, as the District Court held, there was only one partnership, doing business in Boston, New York, and elsewhere. We can see no adequate reason why creditors of a firm which, upon any theory, had two Massachusetts partners, should by a federal court be enjoined from exercising their ordinary rights to collect in due course in the courts of Massachusetts, or here to reach partnership assets, if properly within the control of the District Court of the United States

for the District of Massachusetts. On the record before us, Imbrie & Co., whether considered as one firm or two firms, are solvent. If the debtors are solvent, there is no reason why local creditors should be sent to a distant jurisdiction in order to secure the ordinary rights of unpaid creditors. On the other hand, if, in the process of liquidation, it is found that the firm, however constituted, is insolvent, then in a court of equity local creditors have rights against local assets, including the individual estates of the partners. Francis v. McNeal, 228 U. S. 695, 700, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A. 1915E, 706. The situation would then be analogous to that which obtains in the settlement of estates of deceased nonresidents. Compare Gen. Laws Mass. c. 199. The provisions of this chapter are but declaratory of equitable principles worked out generations ago by our probate judges. In effect they provide that the assets of a deceased nonresident shall not be transmitted to a foreign executor or administrator until citizen creditors have received their equal ratable share of the whole estate. It has always been held that Massachusetts creditors should not be remitted to a foreign jurisdiction in order to obtain their just proportion of a deceased nonresident's Massachusetts property. Dawes v. Head, 3 Pick. (Mass.) 128. Compare, also, G. L. Mass. c. 216, § 146, dealing with the distribution of the assets of an insolvent foreign corporation. The same principles are applied in marshalling and distributing assets by receivers in courts of equity. Thornley v. Walsh Co., 200 Mass. 179, 181, 86 N. E. 355; Buswell v. Iron Hall, 161 Mass. 224, 228, 36 N. E. 1065, 23 L. R. A. 846; High on Receivers (4th Ed.) §§ 47, 306b; Hunt v. Columbian Ins. Co., 55 Me. 290, 92 Am. Dec. 592; Second Nat. Bank v. Lappe Tanning Co., 198 Mass. 159, 162, 84 N. E. 301; Bank Com'rs v. Ass'n, 70 N. H. 557, 562, 49 Atl. 124, 85 Am. St. Rep. 646. See, also, Bankruptcy Act 1898, § 5; Collier, Bankruptcy (12th Ed.) p. 174, and cases cited; Francis v. McNeal, 186 Fed. 481, and 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A. 1915E, 706.

In such cases the questions which arise are questions of comity and of judicial discretion. As the Supreme Court of Maine stated the principle in Hunt v. Columbian Ins. Co., 55 Me. 290, 297 (92 Am. Dec. 592):

"The receivers, who assert this claim here, are merely the servants of the court in New York, having legal authority coextensive only with the jurisdiction of the court by whom they were appointed. Upon principles of comity, often recognized and always acted on, except when they come in conflict with paramount rights of suitors in our courts, they might be admitted here to protect the interests and enforce the claims of the corporation, of whose affairs they are the legal guardians there. But comity does not require us to permit the exercise of such privileges to the detriment of our own citizens who are pursuing appropriate legal remedies in this court."

It must not be overlooked that we are not now dealing with a corporation, which, in important aspects, carries its charter and local law wherever the corporation goes for business purposes. Relfe v. Rundle, 103 U. S. 222, 225, 26 L. Ed. 337. We are here dealing with persons, solvent so far as appears, and liable, jointly and severally, to all creditors of the firm or firms of which they were members. In

Massachusetts, a partnership is not an entity distinct from its members. Francis v. McNeal, 228 U. S. 695, 700, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A. 1915E, 706.

[2] There is no inflexible rule of procedure either to transmit assets and remit creditors from the ancillary to the primary jurisdiction, or to refuse such course. But creditors have a right to intervene to have locally determined the general financial condition of the receivership estates, both in the original and in the ancillary jurisdiction. They may, if the estate is insolvent, so that their rights on a general marshalling of the assets and liability are to receive a dividend only, be entitled to have the validity of their claims passed upon by the local court (Thornley v. J. C. Walsh Co., 207 Mass. 62, 66, 92 N. E. 1007), even if as a matter of business convenience it be found thereafter desirable to put the assets into hotchpot for final computation of the dividend. But the presumption is that local assets should not be put beyond the reach of local creditors until their rights have been secured in some effective fashion. 1 Clark, Receivers, § 431; Pfahler v. McCrum-Howell Co. (D. C.) 197 Fed. 684.

It is therefore plain that the first prayer of the interveners' petition—that the assets should be retained by the ancillary receivers until the further order of said court—should have been granted, and that no such further order should be made until after ascertainment of the facts of controlling importance.

It is almost certain that the question so far discussed will, in this case, prove to be merely moot; for if the partnership with its headquarters in Boston is a separate and distinct partnership from the one with its headquarters in New York, the fact that four of the partners owning all the capital are common to both partnerships would not make the receivership here ancillary (even in the ordinary and somewhat misleading common use of that word) to the receivership in New York.

[3-5] The record, although very long, is most meager and unsatisfactory. But it is clear that the question of one partnership or two will prove to be of controlling importance in the practical disposition of the litigation; we proceed to consider that question. Needless to say, we cannot on this record determine the rights of alleged creditors, other than the interveners, against any of the persons named in the various partnership agreements. We have nothing to do with any possible questions as to liability to creditors by estoppel.

We agree with the conclusion of the master that the question of one partnership or two partnerships must be determined by the construction, under the circumstances of the case, of the agreement of partnership of January 1, 1919, which is as follows:

"James Imbrie, William Morris Imbrie, Frederico Lage, Roswell C. Tripp, and Charles G. West, Jr., engaged as copartners in a general banking business under the firm name of Imbrie & Co., within the provisions of the certain agreements of partnership entered into between them as of December 1, 1917, and May 1, 1918, supplemented August 1, 1918, and December 1, 1918, parties of the first part, hereby admit Waldo S. Kendall, of Rye, New York, and William Minot, of Boston, Massachusetts, parties of the second part, into

general partnership with them in the said banking business upon the following terms and conditions:

"1. This agreement of partnership with respect to Waldo S. Kendall, one of the parties of the second part, supersedes the agreement of partnership made with him as of May 1, 1918, and upon the execution of these articles said agreement of partnership of May 1, 1919, shall terminate and have no further force and effect.

"2. The partnership hereby created shall commence as of January 1, 1919, and continue until the close of business on December 31, 1921.

"3. The parties of the second part shall be the resident partners of the firm of Imbrie & Co., conducting business in the firm's offices at No. 13 Congress street, Boston, Massachusetts, and in and through said Boston office shall devote their entire time and give their best endeavors to the development of the business of this copartnership and the enhancement and success of its enterprises in and through the business of the said Boston office.

"In the case of William Minot it is understood, however, that he may continue his present connection with Laurence Minot in the management of real estate and trusts.

"4. The entire capital and assets of said copartnership and the good will thereof, as said capital, assets, and good will may from time to time have been determined or be determined between the parties of the first part, and the firm name, are and shall continue to be the property of the parties of the first part in such proportions and under such conditions as they shall between themselves have agreed upon, or shall from time to time agree upon, and the parties of the second part hereto do not have and shall not have any title thereto or interest therein, or in the profits of said copartnership, except as herein expressly provided.

"5. Each of the parties of the second part may draw from said firm as a salary the sum of one thousand and forty-one and 67/100 dollars ($1,041.67) monthly during the term of this agreement, being the salary to each of twelve thousand five hundred dollars ($12,500) per year, during the term of this agreement in lieu of all other share or benefit to which he might be or become entitled (except as next hereinbelow provided) as a member of said firm, and the parties of the first part hereby guarantee such monthly payment to the parties of the second part, and further agree to indemnify and hold each of them harmless against any and all share of partnership loss which they might otherwise sustain or incur by reason of any matter or thing arising during the term of this agreement.

"The parties of the second part shall in addition be paid equally between them the amount, if any, by which one-half of the net profits (without deduction of salaries herein) shown upon the books of the Boston office plus one-half of the profits credited to the Boston office upon the books of the firm in New York (and not already credited upon books of the Boston office) shall exceed the sum of twenty-five thousand dollars ($25,000) drawn or drawable in salary by the parties of the second part, as hereinabove provided, as these profits shall appear upon the said books of the firm at the end of each fiscal year.

"For the purpose of determining the business upon which profits shall be computed for division hereunder the territory to be covered by the activities of and through the Boston office shall include, and include only, all of the New England States, and so much of the Dominion of Canada as lies to the east of the longitude passing through the westernmost point of the province of Ontario.

"6. It is understood that the conduct of the business in and through the Boston office, including the placing of loans by the firm with financial institutions, in or about Boston, and the participation of the Boston office in syndicates and underwritings, shall be by or with the approval of the Boston partners, parties of the second part.

"7. The terms and conditions of these presents constitute the agreement between the parties hereto as copartners, and all former understandings or agreements between them are hereby annulled.

"In witness whereof, the parties hereto have hereunto set their hands and seals in septuplicate as of the first day of January, 1919.

"James Imbrie,                [Seal.]
"Wm. Morris Imbrie,      [Seal.]
"Frederico Lage,             [Seal.]
"Roswell C. Tripp,          [Seal.]
"Charles G. West, Jr.,     [Seal.]
                "Parties of the First Part.
"Waldo S. Kendall,        [Seal.]
"Wm. Minot,                  [Seal.]
           "Parties of the Second Part."

"In the presence of
"We hereby consent to the admission of Waldo S. Kendall and William Minot to partnership in the firm of Imbrie & Co., as above provided.

"John F. Trow.
"C. W. Dana."

The chief, pertinent, surrounding circumstances are that in 1917 the two Imbries, Lage, and Tripp entered into an elaborate agreement of partnership, to continue until December 31, 1919, and from year to year thereafter unless 60 days' notice should be given by any partner before the close of any year; that under an agreement dated January 1, 1918, John F. Trow was admitted as a partner for 2 years—having no interest in the assets of the firm, and receiving a fixed sum monthly as salary "in lieu of all other share or benefit to which he might otherwise be or become entitled to as a member of such firm;" he was also indemnified by the other partners against loss; that on the same date an agreement in substantially the same form was made between the four original members and David T. Wells, and on the same date C. A. Dana was, by letter, admitted as a general partner for two years, receiving a share of the profits otherwise accruing to James Imbrie; that on May 1, 1918, an agreement in substantially the same form as those with Trow and Wells was made by the four original partners, with Waldo S. Kendall—Kendall having, like Trow and Wells, no rights in the res of the partnership, and receiving a monthly salary in lieu of a share of profits; that on the same date, May 1, 1918, Charles G. West, Jr., entered into a partnership agreement with the four original partners, making a contribution of new capital. Dana, Wells, and Minot—Minot then having no technical right so to do—signed the approval of admission of West as a partner. Other facts reported by the master concerning the conduct of the partners as indicating their construction of the agreements we regard mainly as immaterial or incompetent. The documents speak for themselves; Brockett v. Bartholomew, 6 Metc. (Mass.) 396; Menage v. Rosenthal, 175 Mass. 358, 56 N. E. 579.

We have then, under these agreements, all anterior to the above agreement of January 1, 1919, a partnership of Imbrie & Co. consisting (in form, at least) of James Imbrie, William Morris Imbrie, Frederico Lage, Roswell C. Tripp, Charles G. West, Jr., Waldo S. Kendall, John F. Trow, Charles A. Dana, and David T. Wells. We say "in form," for we find it unnecessary to consider and determine whether Trow, Wells, and Kendall, having no interest in the name and assets of the firm and no profit-sharing rights beyond stated monthly salaries, were, or were not, partners in fact. Obviously they were held forth

to outsiders as partners. On this record we have nothing to do with partnerships as to third persons. Compare Burdick, Partnerships, c. II, p. 50 et seq.

Before turning to the contract of January 1, 1919, it may be well to consider briefly some of the tests of a real partnership:

In Fechteler v. Palm Bros. & Co., 133 Fed. 462, 466, 66 C. C. A. 336, 340, Judge (afterwards Mr. Justice) Lurton said:

"It is not very prudent to define a partnership. Many definitions have been attempted, and Sir George Jessell, Master of the Rolls, in Pooley v. Driver, L. R. 5 Ch. Div. 459, 471, referred to the fact that no less than 15 such definitions by different learned lawyers, no two of which he says agree, are given in the third edition of Lindley on Partnership, pp. 2, 3. Concerning these he says, 'And I suppose anybody, by reading the 15, may get a general notion of what a partnership means.'"

In Meehan v. Valentine, 145 U. S. 611, 618, 12 Sup. Ct. 972, 973 (36 L. Ed. 835) Mr. Justice Gray said:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits."

And again at page 623 of 145 U. S., at page 975 of 12 Sup. Ct. (36 L. Ed. 835) after reviewing many of the authorities:

"In the present state of the law upon this subject, it may perhaps be doubted whether any more precise general rule can be laid down than, as indicated at the beginning of this opinion, that those persons are partners, who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow, that the acts of one in conducting the partnership business are the acts of all; that each is agent for the firm and for the other partners; that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts; that all are liable as partners upon contracts made by any of them with third persons within the scope of the partnership business; and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership."

In Manson v. Williams, 153 Fed. 525, 82 C. C. A. 475, Judge Putnam, speaking for this court, said:

"Probably the best definition of partnership is that found in the Partnership Act of 1890 (St. 53 & 54 Vict. c. 39), which reads as follows: 'Partnership is the relation which subsists between persons carrying on a business in common, with a view of profit.' It is necessary to note the significance of the words 'carrying on a business,' which implies a relation entirely different from the enforced relation of tenants in common, as the owners of a ship or of a house, who must either let the property lie idle or keep it in some way occupied or used, deriving a return from such occupation or use."

Mr. Pollock's definition is most suggestive (Pollock, Partnership [11th Ed.] p. 4):

"Partnership is the relation which subsists between persons who have agreed to share the profits of a business carried on by all or any of them on behalf of all of them."

It would be of no value to multiply definitions, which may be found in large numbers in such works as 1 Rowley on Partnerships, § 25 et seq.; Burdick, Partnership, § 3. Agency, inter sese, and profit sharing are certainly important indicia.

So far as the problem before us is concerned, we think it may be best tested by considering the rights and powers of Kendall and Minot, the Massachusetts partners, under the agreement of January 1, 1919. In effect the court below held that Kendall and Minot were partners of Imbrie & Co. in New York, Chicago, and elsewhere. We think this document, construed in the light of the surrounding circumstances, does not warrant that conclusion, which seems to rest almost entirely upon the recital in the first sentence of the agreement, that the two Imbries, Lage, Trow and West "engaged as copartners in a general banking business under the name of Imbrie & Company within the provisions" of written agreements referred to by date, "admit Waldo S. Kendall * * * and William Minot * * * into general partnership with them in the said banking business upon the following terms and conditions." This general recital must be construed in proper relation to "the following terms and conditions." And the very next term and condition is that Kendall, one of the partners, actual or apparent under the agreement of May 1, 1918, was cut out of the old partnership, and a new status created for him under this contract of January 1, 1919. We find it impossible to believe that if the parties had intended Kendall to remain a general partner in Imbrie & Co. wherever business under that name was carried on, his pre-existing relations under the agreement of May 1, 1918, would have been thus ended. But we have an explicit provision that this new agreement "supersedes the agreement of partnership made with him as of May 1, 1918, and upon the execution of these articles said agreement of partnership of May 1, 1918, shall terminate and have no further force and effect." This left Kendall a partner under the new agreement only.

Minot, of course, had no rights, powers or obligations with relation to Imbrie & Co. outside of Boston, unless they were given by this agreement of January 1, 1919, and it gave him none; by implication it denied him such rights, powers and obligations. For in paragraph 6 of this agreement we find an explicit provision that "the conduct of the business in and through the Boston office * * * and the participation of the Boston office in syndicates and underwritings shall be by or with the approval of the Boston partners." Inclusio unius, exclusio alterius. As to the Boston office and as to the Boston business alone were the Boston partners entitled to be consulted.

Test the question in this way: Suppose Kendall and Minot had gone to Chicago and, in the name of Imbrie & Co., undertaken to bind the concern in important transactions; whatever the rights of third parties might be as to contracts thus made by them, it is clear that the other members of the firm would have been fully warranted in regarding such acts by Kendall and Minot as a breach of the partnership undertaking; a breach so serious that, if persisted in, a court of equity would on application, have dissolved the partnership created by the agreement of January 1, 1919.

Otherwise stated: Kendall and Minot were not agents of the partnership of Imbrie & Co. in any transaction outside of the Boston territory; they had no right to hold themselves forth as partners of Imbrie & Co. in any transactions outside of the Boston territory.

Another important test is that of profit sharing. There is, and can be, no contention that Kendall and Minot had any right to share in any profits, except those which were made in the Boston territory.

Nor would they naturally be expected to agree to render themselves liable in extensive business transactions concerning which they had no right to be consulted or to express in any fashion approval or disapproval.

We have, then, an agreement under which the Imbries, Lage, Tripp, and West furnished in Boston, as in New York and elsewhere, all the capital but agreed that the profits of the Boston business should be divided in designated proportions between themselves and Kendall and Minot; Kendall and Minot were entitled to be consulted as to the Boston business, and only as to the Boston business, and had, consequently, no right to deal with third parties or in any other way to interfere with the business done outside of Boston. It follows, we think, conclusively, that the Boston partnership was a separate and distinct partnership.

Additional facts pointing to the same conclusion are that Trow, Dana and Wells were agreed to be held forth as partners of Imbrie & Co. outside the Boston territory and were not authorized to be so held forth with relation to the Boston business; Kendall and Minot never agreed that Trow, Dana and Wells, or any of them, should be held forth to the world at large as authorized to sign the name of "Imbrie & Co." in the Boston business. The Imbries, Lage, Tripp, West, Kendall, and Minot—no one else—were "carrying on the Boston business." Manson v. Williams, supra. Other considerations leading to the same conclusion we think it unnecessary to mention.

It results that the receivership here is not ancillary to that in New York, and that the New York receivers had no standing to ask the court here to sequestrate the Boston assets and to enjoin the creditors of the Boston partnership from enforcing their rights. But the receivership here exists by consent of the Boston partners; they have no standing to question its validity. It must be ended on terms as consistent as possible with the rights of creditors, who have already for two years been deprived of their ordinary rights. The more logical course would be to vacate this receivership. On the other hand, if the allegation in the petition for the appointment of ancillary receivers—to the effect that the assets in Boston are worth, in excess of secured and unsecured debts, in the neighborhood of about $5,000— should be found to be true, the rights of creditors here may perhaps be more speedily and economically recognized and enforced by requiring the receivers to liquidate these assets, pay the debts of the Boston partnership in full, remitting any balance to the four partners who own all the capital of the Boston firm. This is what the intervening creditors seek, and, so far as now appears, they are entitled to such relief.

The decree of the District Court is reversed, with costs to the appellants in both courts, and the case is remanded to that court for further proceedings not inconsistent with this opinion.