M. L. VIRDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5200.   Promulgated April 29, 1927.

1. An oral contract of partnership between a husband and wife is valid under the laws of Mississippi.

2. Determination of March 1, 1913, value of certain real estate.

3. Determination of date of repossession of real estate previously sold.

*Chas. D. Hamel, Esq., Benj. H. Saunders, Esq.,* and *O. R. Ewing, C. P. A.,* for the petitioner.

*J. E. Marshall, Esq.,* for the respondent.

This proceeding involves the redetermination of deficiencies in income tax for the years 1918, 1919, and 1920, in a total amount of $33,852.64. These deficiencies arise (1) from the refusal of the Commissioner to recognize that R. L. Virden, wife of petitioner,

was a partner in the M. L. Virden Lumber Co. during the years 1918, 1919, and 1920; (2) from the refusal of the Commissioner to recognize a partnership between R. L. Virden, wife of petitioner, and J. R. Hervey in the operation of a plantation near Moorhead, Miss., during the years 1919 and 1920; (3) the determination by the Commissioner that the March 1, 1913, value of a brick business building in Moorhead, Miss., sold by petitioner in 1920, was $2,500; and (4) the determination of the Commissioner that the petitioner repossessed himself in 1920 of the property known as the Swan Lake Plantation, which he sold in 1919 to one Mike Seghesio.

In an amended answer, respondent alleges that in addition to income set forth in the 60-day deficiency letter, which is the basis of the petition, the petitioner received income in 1920 in the sum of $10,693.90, which the respondent alleges the petitioner willfully, falsely, and fraudulently failed to report on his income-tax return for that year.

FINDINGS OF FACT.

The petitioner is a resident of the City of Greenville, Miss., with his principal office in that city.

Prior to January 1, 1918, the petitioner was a stockholder in the Virden Lumber Co., which was a Mississippi corporation. This corporation, which was engaged in the lumber business, was organized with a capital stock of $7,000, of which $2,000 was issued to C. E. Couty, and $5,000 was issued in the name of petitioner. The capital stock of the corporation was increased to $10,000. The petitioner purchased the stock of Couty and thereupon all the stock of the corporation stood in his name. R. L. Virden is the wife of petitioner. At the time she married petitioner, she owned real and personal property to the extent of about $15,000, part of which was used to purchase the stock of the corporation which stood in petitioner's name. The Virden Lumber Co. was dissolved in 1917, whereupon the petitioner proposed to his wife that they form a partnership to carry on the business. To this she agreed. The agreement was oral, providing that they should equally share the profits and losses and the partnership was organized under the firm name of M. L. Virden Lumber Co. A new set of books was not opened, but the old corporation books were continued. These books reflected as of January 1, 1918, the joint interest of petitioner and his wife in the business, each owning one-half; the books showing that the petitioner had a $25,000 investment and his wife an equal amount. At the end of the year the books showed that the petitioner was credited with $27,500 and his wife with an equal amount, thus showing an investment of each of $27,500.

Each party made withdrawals and the petitioner drew a salary of $500 per month. The wife took no active part in the business. Upon the dissolution of the corporation and the formation of the partnership, the petitioner notified the banks and the persons and corporations with whom he was dealing, and also the mercantile agencies, of the dissolution of the corporation and the formation of the partnership and the interest of the partners therein. The partnership first transacted business with the Greenville Bank & Trust Co. The officers of this bank were informed of the dissolution of the corporation, the formation of the partnership, and the names of the members thereof. Additional credit was extended the partnership by reason of the fact that R. L. Virden was a partner. She was no longer asked to endorse the paper of the concern as she had been required to do during the existence of the corporation, for the reason that being a member of the partnership, she was bound by the obligations thereof. In November, 1920, the M. L. Virden Lumber Co. transferred its account to the First National Bank of Greenville. The officers of this bank were also informed of the facts relating to the partnership. There is in the file a signature card filed with that bank on November 15, 1920, which states that the names of the partners were M. L. Virden and R. L. Virden. R. G. Dun & Co., and the Bradstreet Company, in the publications made for the use of their subscribers, rated the M. L. Virden Lumber Co. as a partnership composed of M. L. Virden and R. L. Virden. The reports by these agencies were based not only on the representations of the persons reported, but also upon a verification of their statements made after thorough investigation. Suits were filed in the name of the petitioner and his wife, as partners, and deeds of trust, which were public records, were taken in their names as partners.

It was stipulated, and we so find, that the net income of the M. L. Virden Lumber Co. was as follows:

|  | Net income. |
|---|---|
| 1918 | $17,954.87 |
| 1919 | 48,143.08 |
| 1920 | 24,769.31 |

In 1911 or 1912, M. L. Virden acquired a farm near Moorhead, Miss. The petitioner and J. R. Hervey operated this plantation as partners. In 1918, M. L. Virden, in consideration of love and affection, conveyed this farm to his wife, and Hervey and M. L. Virden rented the property from her during the year 1918, at a rental of $5,000 per annum, and operated the farm as partners. After the expiration of the lease and beginning with 1919, Mrs. Virden conducted the farm with Hervey, as partners. She contributed the farm and 50 per cent of the expenses as her share of the obligations, and Hervey contributed his services and 50 per cent of the expenses

as his share of the expenses of the partnership. Whenever money was needed to operate the farm, Hervey would advance one-half of the money and draw upon Mrs. Virden for the remaining half. The receipts were divided equally. Although the respondent denies that R. L. Virden was a member of the partnership of Hervey & Virden, it was stipulated, and we so find, that the net income of Hervey & Virden, for the year 1919, was $46,699.79, and that said partnership sustained a net loss for the year 1920 of $10,076.28.

It was stipulated, and we so find, that in 1910 or 1911, the petitioner purchased at a bankrupt sale a brick business building at Moorhead, Miss., for the sum of $2,250; that he sold it in 1920 for $4,250; and that the depreciation sustained to date of sale was $205. The fair market value of the property on March 1, 1913, was $3,500.

In 1917, the petitioner acquired what is known as the Swan Lake Plantation, at the following original cost:

| | |
|---|---:|
| Price paid | $65, 784. 07 |
| Commissions paid in cash | 12, 625. 00 |
| Expenses paid in connection with sale | 904. 00 |
| Commissions to be paid in 1920 | 19, 625. 00 |
| Total cost | 98, 938. 07 |

This plantation was sold November 19, 1919, to Mike Seghesio for $199,000, paid and to be paid as follows: Cash paid during the year 1919, $35,000, liabilities assumed, $25,000, and notes as follows: January 5, 1920, $25,000, and ten notes for $11,400 each, the first being payable January 5, 1921, and the remaining nine notes on January 5 of each succeeding year. It was stipulated, and we so find, that the percentage of profit contained in each installment is 50.282 per cent. The purchaser paid the $25,000 note which matured January 5, 1920, and made no further payments on the purchase price. In November, 1920, the purchaser, who had produced a crop, notified the petitioner that he could make no further payments and was going to leave the place. This he did in November, 1920, taking with him all his personal property. The petitioner's income-tax return for the calendar year 1920 was verified by him on March 12, 1921. In this return he states "in 1917 and 1919 I bought three separate tracts of adjoining lands from three different owners, composing what is known as the Swan Lake Plantation, and in 1919 sold the whole place to two different purchasers at different dates and reported the sales in my 1919 I. T. return as installment sales. The portion sold to Mike Seghesio I had to repossess in 1920."

During the year 1920 M. L. Virden Lumber Co. of Greenville, Miss., transmitted to the Planters Lumber Co. of Jackson, Miss., its two checks of $5,922.52 and $4,787.48, respectively; the Planters Lumber Co. took these checks to the Jackson-State National Bank of Jackson, Miss., where exchange was purchased payable to M. L.

Virden in the amount of $5,313.62, and $600 for the first check, and $3,880.28 and $900 with the second check; and the same were endorsed by M. L. Virden. The drafts for $5,313.62 and $600 were each dated August 7, 1920, and the drafts for $3,880.28 and $900 were each dated October 19, 1920. In 1924 the Planters Lumber Co. suffered a fire which destroyed many of its records. The bills payable account of the Planters Lumber Co. showed on December 31, 1919, a total of $34,600, and this total included five notes of the Planters Lumber Co., for $2,000 each, payable January 1, 1920, to M. L. Virden, and bearing interest at the rate of 6 per cent. It was the custom of petitioner, acting for the M. L. Virden Lumber Co. and B. L. Fulton, who was secretary-treasurer and active manager of the Planters Lumber Co., of which petitioner was president, to buy lumber in large lots for themselves and for each other. In the summer of 1920, Fulton purchased several carloads of lumber from the Edward Hines Lumber Co., some of which were consigned to the M. L. Virden Lumber Co. The petitioner returned as income for 1920, $693.90 of the $10,693.90 paid to him by the Planters Lumber Co. The remaining $10,000 was not income to the petitioner.

### OPINION.

MILLIKEN: It may be stated at the outset, that among the facts found are some which are not competent to prove the existence of the partnership, but which are competent to show the good faith of the petitioner and his wife. They show that instead of the partnership being a secret affair and disclosed only when convenient, the partners published the facts to the business world.

The record in this proceeding discloses that the petitioner and his wife on January 1, 1919, joined together to carry on a trade or business for their common benefit, one contributing property and the other property and services, and that they had a community of interest in the profits. This is sufficient to constitute a partnership between them. Cf. *Meehan* v. *Valentine*, 145 U. S. 611; *Brooks* v. *Smith*, 290 Fed. 33, holding that such a contract between husband and wife was valid under the laws of the State of Mississippi. A husband and wife can form a valid partnership under the laws of Mississippi (Miss. Code, 1906, § 2517; *Jones* v. *Jones*, 99 Miss. 600; 55 So. 361). At common law a contract of partnership may be oral. See Rowley's Modern Law of Partnership, § 212. Respondent, however, contends that a contract of partnership between a husband and wife, to be valid in Mississippi, must be in writing and cites section 2521 of the Mississippi Code of 1906. That section reads:

*Restrictions as to Contracts between husband and wife.*—Husband and wife shall not contract with each other, so as to entitle the one to

claim or receive any compensation from the other for work and labor, and any contract between them whereby one shall claim or shall receive compensation from the other for services rendered, shall be void; and it shall not be lawful for the husband to rent the wife's plantation, houses, horses, mules, wagons, carts, or other implements, and with them, or with any of her means, to operate and carry on business in his own name or on his own account, but all business done with the means of the wife by the husband shall be deemed and held to be on her account and for her use, and by the husband as her agent and manager in business, as to all persons dealing with him without notice, unless the contract between the husband and wife which changes this relation, be evidenced by writing, subscribed by them, duly acknowledged, and filed with the chancery clerk of the county where such business may be done, to be recorded as other instruments.

This section is, with a few changes which are immaterial to the question involved, the same as section 1177 of the Code of 1880, and section 2293 of the Code of 1892. A leading case on the construction of this section is *Porter* v. *Staten*, 64 Miss. 421; 1 So. 487. In that case, the defendant was the widow of a Dr. Staten, who besides being a practicing physician, devoted his attention to the cultivation of his wife's farm. He contracted a debt with the plaintiffs for supplies for the plantation and for the family, and for money advanced him which he used in the purchase of medicines. The plaintiffs dealt with the husband in ignorance of the fact that the farm was owned by his wife. The court thus states the evil sought to be remedied by section 1177 of the Code of 1880, now section 2521 of the Code of 1906:

The evil intended to be remedied by this section of the Code was one which was becoming of frequent recurrence, as shown by the results of litigation in this state. Husbands of the owners of separate estates would devote their attention to the business carried on with the property of the wife; but, if the business proved to be unprofitable, the wife would escape liability for debts contracted in the business by the easy device of setting up a secret arrangement or contract, by the terms of which it would be shown that the property had been leased or hired to the husband, and the business transacted as his own and for his exclusive benefit. In such cases judgments against the husband would be fruitless, and creditors who had dealt in good faith with him, believing him to have been the agent of the wife, were defrauded by finding the property to be in one person, and the risks incident to the business to which it had been devoted shifted to an insolvent by bed-chamber arrangements, which, whether real or simulated, it was impossible to disprove.

After holding that the common law obligation of the husband to provide for his family was not changed or modified by the statute, and that the defendant was liable as an undisclosed principal for supplies purchased for the operation of the farm, the court held:

We think the defendant is responsible, as an undisclosed principal, for those items on the account, and those only, bought for the use and benefit of the business transacted with her property, and that the burden of proof is upon the plaintiffs to show what items fall within that class.

In *Ross* v. *Baldwin*, 65 Miss. 570; 5 So. 111, the court had before it the question whether the wife could make her husband her agent in a transaction not covered by section 1177 of the Code of 1880. The opinion in that case in part reads:

This case is distinguished from *Porter* v. *Staten*, 64 Miss. 421, 1 South. Rep. 487, by the fact that. here the principal was known, and not undisclosed, as in the other case, and the credit was given to the principal, the wife. Section 1177 of the Code makes the husband the wife's agent in the state of case it mentions, and, as a wife is not under any disability to contract, she may by her conduct, make the agency of her husband broader than that provided for by section 1177. She may do this expressly or by a course of dealing.

To the same effect see *Johnson* v. *Jones*, 82 Miss. 483; 34 So. 83.

In *Leinkauf* v. *Barnes*, 66 Miss. 207; 5 So. 402, the court held that the fact that the wife had loaned to her husband money with which to go into business, did not make her liable as a principal under section 1177 of the Code of 1880. Among other things, the court said:

The second clause of the statute begins by enumerating the plantation, houses, horses, mules, wagons, carts, and implements of the wife as things which the husband should not rent from the wife, and conduct business therewith in his own name, except by virtue of a written contract, indicating thereby that the attention of the legislature was directed principally to the evils that arose from business conducted by the use of such property, and then broadens into the terms " or any of her means." It is a well-settled rule of construction that where special words are used, and they are followed by words of more general import, the general words are to be limited to matters *ejusdem generis* with the special words, unless an intention may be found to extend their meaning. This rule, of course, excludes the suggestion that the mere use of general words is sufficient to indicate a purpose to include matters not *ejusdem generis*. It is but the application of a principle that governs men in their usual intercourse, and applies language to the subject with which the speaker is dealing, and limits or expands the words used to accord to his understanding and intention. We find neither in the subject-matter nor in the other words of the statute anything indicating a purpose to include within the import of the words " any of her means " property other than that of a visible, tangible character, the possession of which is indicative of ownership, and calculated to invite the public to deal with the possessor as owner, and to mislead it to its injury if the truth be found to be otherwise. On the contrary, the language of the whole section is peculiarly appropriate to visible property, and unless money is included in the words " her means " there are none in which it may be found.

Further, the court said:

This section (1177) relates exclusively to cases in which the husband transacts the business in his own name with property which, though used in the business, continues throughout the property of the wife.

These excerpts clearly show that section 2521 of the Mississippi Code has no application to the question whether a partnership may be created between a husband and wife in Mississippi by an oral agreement. This section is clearly a creditor's statute to protect per-

sons dealing with a husband and wife, especially in those cases where they could, by secret contract, throw the liability from one shoulder to the other by agreements of which no creditor had any notice. This view is borne out by *Ross* v. *Baldwin, supra,* where it is pointed out that the wife is under no disability to contract and may even by her conduct, irrespective of contract, constitute her husband her agent so as to be bound by his acts.

Under these authorities it is evident that the relation between the petitioner and his wife was that of a valid partnership. One-half of the stipulated income of the partnership should be excluded from the income of the petitioner.

What has been said with reference to the partnership between the petitioner and his wife applies to the partnership between her and Hervey, and results in the exclusion of income to the petitioner from this source.

While both the petitioner and Hervey have testified that the brick business building in Moorehead, Miss., which was sold by the petitioner in 1920, was worth $4,000 on March 1, 1913, we are not impressed by the testimony of petitioner nor with the qualifications of Hervey as an expert in the valuation of real estate. It is shown in the record that houses in Moorehead, situated in the same block and which are said to have been similar to the one sold by the petitioner, were sold in 1908 and 1912 for $3,300 and $3,500, respectively. It is further shown that improvements were made on the block in which the house stood, subsequent to date of purchase and prior to March 1, 1913, which tended to increase the value of petitioner's property. The petitioner, however, testified that immediately following the World War, there was an enhancement of property values in that vicinity " to a considerable degree." The record shows that the sale by petitioner in 1920 was made by him as a willing seller to a willing buyer, and fairly indicates the value of the property on the date of sale. Taking into consideration the fact that a considerable portion of the increase in price arose subsequent to the World War, we believe that $3,500 was the fair market value of the property on March 1, 1913.

The sole question with reference to the Swan Lake Plantation, or so much of it as was sold to Mike Seghesio, is whether it was repossessed by the petitioner in the year 1920. The only testimony on this point is that of petitioner himself and consists of his income-tax return as set forth in the findings of fact and his testimony at the hearing, which took place in November, 1926. This latter testimony consists of what he thought he remembered relative to a transaction which took place nearly six years previous. While he testifies that repossession was had on February 9, 1921, he states that he derived this information from a telegram which he received on the day of

trial of this proceeding from an attorney and which was excluded from the evidence. He was asked on cross-examination:

Q. Did he [Seghesio] sign any papers to the effect that he would agree to waive any of his legal rights in the matter so that you could have immediate possession?

A. No, sir; he did not.

Shortly afterwards he was again asked:

Q. Do you know whether or not Mike Seghesio waived any of his legal rights concerning the time or manner of the foreclosure?

A. No, sir; I do not.

In view of the fact that the testimony of the petitioner is based on an imperfect recollection of that which could have been proved by documentary evidence and in view of the fact that petitioner in his income-tax return made about three months after the transaction occurred, and when it was fresh in his mind, stated that he repossessed the property in 1920, we are impelled to the conclusion that the Commissioner did not err in taxing this transaction upon the basis of repossession in 1920.

While it is not clear how simple interest at the rate of 6 per cent on a $10,000 debt ran into the uneven amount of $693.90, and although it is a peculiar coincidence that the amount of the checks of the M. L. Virden Lumber Co., less the cost of exchange, amounted precisely to the debt and interest of the Planters Lumber Co. to the petitioner, nevertheless the burden rests upon the respondent to prove that the payment of $10,693.90 was income to the petitioner. It is shown that the drafts represented the proceeds of the checks of the M. L. Virden Lumber Co. If the checks were not given to the Planters Lumber Co. for value, the whole transaction would amount simply to a circuitous transfer of the funds from the M. L. Virden Lumber Co. to the petitioner, and would come out of the profits of that company. But the net income of that company has been stipulated and the amount of the checks can not be added thereto. The account of the affair given by the petitioner and by the manager of the Planters Lumber Co. is not unreasonable and that version is that the checks of the M. L. Virden Lumber Co. to the Planters Lumber Co. were given in payment for lumber bought by the Planters Lumber Co. from the Edward Hines Lumber Co. and consigned to the M. L. Virden Lumber Co., and the drafts were delivered to petitioner in payment of the debt of $10,000 and interest due by the Planters Lumber Co. to petitioner. The respondent has failed to prove that $10,000 of the said sum of $10,693.90 received by petitioner, was income to him. The remaining $693.90 was duly returned by the petitioner. We, therefore, find that the petitioner did not receive the additional income in amount of $10,693.90 in the year 1920, and there is likewise no justification for the imposition of the 50 per cent fraud penalty

pursuant to the provisions of section 250(b) of the Revenue Act of 1918.

*Judgment will be entered on 20 days' notice, under Rule 50.*